John ARMSTRONG, et al., Plaintiffs,

v.

Edmund G. BROWN, Jr.,
et al., Defendants.

No. C 94–2307 CW.

United States District Court,
N.D. California.

April 11, 2012.

Opinion Granting Motion in Part
and Denying Motion in Part
Aug. 28, 2012.

Donald H. Specter, Sara Linda Norman, Alison Hardy, Arlene Brynne Mayerson, Disability Rights Education & Defense Fund, Inc., Berkeley, CA, Michael William Bien, Blake Thompson, Ernest James Galvan, Gay Crosthwait Grunfeld, Kenneth Michael Walczak, Lisa Adrienne Ells, Rosen Bien & Galvan, LLP, Loren Dougherty Stewart, Federal Public Defender's Office, Shawn Hanson, Akin Gump Strauss Hauer & Feld LLP, Jennifer Lee Jonak, Lukens Law Group, Warren E. George, Bingham McCutchen LLP, Caroline Nason Mitchell, Jones Day, Martin H. Dodd, Futterman Dupree Dodd Croley Maier LLP, San Francisco, CA, Mark Raymond Feeser, Megan Hagler, Attorney at Law, San Rafael, CA, for Plaintiffs.

Paul Brian Mello, Hanson Bridgett LLP, Danielle Felice O'Bannon, Attorney General's Office, Jay Craig Russell, Rochelle C. East, Scott John Feudale, Kyle Anthony Lewis, Office of the Attorney General Jose Alfonso Zelidon-Zepeda, Department of Justice, Gregg McLean Adam, Esq., Jennifer Spencer Stoughton, Ronald Yank, Esq., Carroll, Burdick & McDonough, LLP, Edward W. Swanson, Swanson & McNamara LLP, San Francisco, CA, Benjamin Cornelius Sybesma, Christine Albertine, California Correctional Peace Officers' Association, West Sacramento, CA, for Defendants.

## AMENDED ORDER GRANTING PLAINTIFFS' RENEWED MOTION TO REQUIRE DEFENDANTS TO TRACK AND ACCOMMODATE NEEDS OF ARMSTRONG CLASS MEMBERS HOUSED IN COUNTY JAILS, ENSURE ACCESS TO A GRIEVANCE PROCEDURE, AND TO ENFORCE 2001 PERMANENT INJUNCTION (Docket No. 1912)

CLAUDIA WILKEN, District Judge.

Plaintiffs move for an order requiring Defendants to track and accommodate the needs of *Armstrong* class members housed in county jails and to provide access to a workable grievance procedure. Defendants oppose the motion. The matter was heard on October 27, 2011. Having considered oral arguments and all of the materials submitted by both parties, the Court GRANTS Plaintiffs' motion.

## BACKGROUND

This lawsuit was originally filed seventeen years ago by disabled prisoners and parolees against the California officials with responsibility over the corrections and parole systems. This Court certified Plaintiffs as representatives for a class

including "all present and future California state prisoners and parolees with mobility, sight, hearing, learning, developmental and kidney disabilities that substantially limit one or more of their major life activities." Order Granting Pls.' Mots. to Am. Compl. and Modify the Class, Docket No. 345, January 5, 1999, at 2.[1] On behalf of the class, Plaintiffs sought accommodations for their disabilities, as required under federal statutes and the United States Constitution.

Initially, Plaintiffs sued two divisions of the then California Youth and Adult Corrections Authority (the Agency). The two divisions sued had separate areas of responsibility toward prisoners and parolees: the Board of Prison Terms (BPT) had authority over parole and parole revocation hearings, and the California Department of Corrections (CDC) was responsible for all other aspects of prisoners' and parolees' lives, including supervision of parolees.[2] By agreement of the parties, litigation against the two divisions was initially bifurcated and proceeded on two separate tracks.

On September 20, 1996, 942 F.Supp. 1252 (N.D.Cal.1996), this Court ordered CDC and related Defendants to develop plans to ensure that their facilities and programs were compliant with the American With Disabilities Act (ADA), 42 U.S.C. §§ 12131 et seq., and readily accessible to and usable by prisoners and parolees with disabilities. The order also required Defendants to develop policies to provide a prompt and equitable disability grievance procedure, to allow approved assistive aids for prisoners with disabilities in segregation units and reception centers, and to ensure accessibility in new construction and alterations. Remedial Order, Injunction and Certification for Interlocutory Appeal, September 20, 1996. The Court retained jurisdiction to enforce its terms. Id. at 5.[3]

Following a bench trial in April and May 1999, the Court found on December 22, 1999 that BPT and other Defendants responsible for conducting parole proceedings were in violation of the ADA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Due Process Clause of the Fourteenth Amendment. Findings of Fact and Conclusions of Law, December 22, 1999, Docket No. 523.

The Court's Findings of Fact and Conclusions of Law held that:

> Defendants cannot avoid ADA and Section 504 liability by delegating responsibility for their delivery of programs, services and activities, or for the facilities in which they provide these programs, to

---

1. The Plaintiff class was certified on January 13, 1995. On December 24, 1998, the parties stipulated to amend the class definition to include "all present and future California state prisoners and parolees with mobility, sight, hearing, learning and kidney disabilities that substantially limit one or more of their major life activities." Stipulation and Order Amending Pl. Class, Docket No. 342, December 24, 1998, at 2. The class definition was subsequently modified, as to Defendants Board of Prison Terms (BPT) and Chairman of the BPT only, to add prisoners and parolees with developmental disabilities on January 5, 1999. Order Granting Pls.' Mots. to Am. Compl. and Modify the Class, January 5, 1999, at 2.

2. Since this lawsuit was originally commenced, the Agency has been reorganized and superseded by the California Department of Corrections and Rehabilitation (CDCR). BPT is now the Board of Parole Hearings (BPH). CDC has been replaced by the Division of Adult Institutions (DAI) and the Division of Adult Parole Operations (DAPO).

3. The Ninth Circuit affirmed the injunction against the CDC Defendants on appeal. See Armstrong v. Wilson, 124 F.3d 1019 (9th Cir. 1997), cert. denied, 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998).

the CDC or any other entity. The implementing regulations of both the ADA and Section 504 prohibit covered entities from discriminating against individuals with disabilities "directly or through contractual, licensing, or other arrangements." The BPT is thus legally obliged to ensure non-discrimination wherever programs, services or activities are provided to Plaintiff class members. Additionally, the BPT cannot avoid liability for violations of the physical accessibility standards by holding its programs in locations under the control of other entities.

Findings of Fact and Conclusions of Law, at 90 (internal citations omitted). At that time, the Court also found that certain large jail facilities utilized by these Defendants for parole proceedings, including the Los Angeles County Men's Jail, were inaccessible for people with disabilities, which raised an inference that this was a system-wide problem. *Id.* at 31–32. The Court determined that these Defendants violated the rights of class members in county facilities for parole revocation proceedings in many of the same ways alleged in the instant motion, including depriving them of

assistive devices for mobility problems or accommodations for hearing and vision impairments. *Id.* at 32–38, 41–43, 45–47, 49–52, 60–66. The Court also recognized that these Defendants did not have an adequate system for tracking the facts of parolees' disabilities in their files, or for allowing parolees to communicate their accommodation needs. *Id.* at 38–40. Based on its Findings of Fact and Conclusions of Law, the Court entered a permanent injunction as to these Defendants. Permanent Injunction, Docket No. 524.[4]

On January 3, 2001, the CDC Defendants amended their Court Ordered Remedial Plan regarding the provision of programs and services to inmates and parolees with disabilities. The Remedial Plan requires Defendants to ensure that prisoners and parolees with disabilities are accessibly housed, that they are able to obtain and keep necessary assistive devices, and that they receive effective communication regarding accommodations. *Id.* at 1–7, 27–28, 32, 34, 46–47. The Remedial Plan also requires Defendants to include in all contracts language that requires subcontractors to comply with the ADA. *Id.* at 46.

---

4. On appeal, the Ninth Circuit affirmed the injunction against the BPT Defendants with minor changes. *See Armstrong v. Davis,* 275 F.3d 849, 879 (9th Cir.2001), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72, 154 L.Ed.2d 14 (2002). Several cases have since indicated that the Ninth Circuit's decision in *Armstrong* was abrogated in part by *Johnson v. California,* 543 U.S. 499, 504–05, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). *See, e.g., Harris v. Alvarado,* 402 Fed.Appx. 180, 181 (9th Cir. 2010); *Kirola v. City of San Francisco,* 2011 WL 1330853, at *4 (N.D.Cal.); *Ortega–Melendres v. Arpaio,* 836 F.Supp.2d 959, 989–90 (D.Ariz.2011). However, this is not accurate.

In *Johnson v. California,* the Supreme Court held that the CDC's policy of racially segregating inmates, like all racial classifications imposed by the government, should be considered under strict scrutiny, rather than under the deferential standard articulated in

*Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), under which a court considers whether regulations that burden the prisoners' fundamental rights are reasonably related to legitimate penological interests. 543 U.S. at 504–15, 125 S.Ct. 1141.

*Armstrong,* however, did not concern or discuss racial classification; instead, it concerned appropriate accommodations for prisoners and parolees with disabilities. In *Armstrong,* the Ninth Circuit considered whether the state had provided a legitimate penological justification for its failure to comply with the ADA under the standard articulated in *Turner v. Safley,* assuming, without deciding, for the purposes of its discussion that this standard applied to both prisoners and parolees. 275 F.3d at 873–74. It did not review "race-based prison regulations" as some courts apparently believe that it did. *Harris v. Alvarado,* 402 Fed.Appx. at 181.

The Court entered a Revised Permanent Injunction against the BPT Defendants on February 11, 2002. The Revised Permanent Injunction requires these Defendants to provide accommodations, at all parole proceedings, to prisoners and parolees with disabilities. Revised Permanent Injunction, February 11, 2002, ¶ 17. The subsequent Order Granting Motion to Enforce Revised Permanent Injunction issued on May 30, 2006, requires that Defendants develop and implement a plan to ensure that necessary accommodations are provided to class members without delay. Order Granting Motion to Enforce Revised Permanent Injunction, May 30, 2006, at 8–9. In that Order, the Court found that Defendants did not have an adequate system to track parolees with disabilities. *Id.* at 4. The Court also found that, as a result, parolees with disabilities were not being provided with required accommodations, including mobility assistance for paraplegics and sign language interpreters for deaf parolees. *Id.* at 5–6. At that time, Defendants did not contest the extensive evidence that Plaintiffs submitted to demonstrate ongoing violations of the same type alleged in the instant motion, such as evidence that a paraplegic parolee had to drag himself up stairs. *Id.*

On September 11, 2007, 2007 WL 2694243, in response to Plaintiffs' motion to enforce the May, 2006 Order Granting Motion to Enforce Revised Permanent Injunction, this Court Ordered:

> Within thirty days of this order, Defendants shall report to Plaintiffs' counsel which housing units in Alameda, Sacramento and Los Angeles County Jail facilities are wheelchair accessible and how Defendants ensure that class members at those institutions who are designated DPW and DPO are housed in the accessible facilities and receive necessary accommodations and assistive devices in both their housing units and at their hearings. Within ninety days of this order, Defendants shall do the same with the remaining county jails. A necessary component of both reports is how Defendants track class members who are housed in county facilities due to parole holds.

Order Granting in Part Plaintiffs' Motion to Enforce the May 30, 2006 Order, ¶ 19. At that time, the Court found that Defendants' tracking system for information about disabilities of prisoners and parolees was still inadequate. *Id.* at 4–6. The Court also found that Defendants had failed to develop an adequate plan to provide needed accommodations for parole proceedings in county jails and rejected Defendants' assertion that "county jails provide adequate access to necessary assistive devices for class members" as without proof. *Id.* at 9–10.

On May 28, 2009, Plaintiffs filed a Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure.

On September 16, 2009, 261 F.R.D. 173 (N.D.Cal.2009), this Court held that Defendants are responsible for ensuring that *Armstrong* class members receive reasonable accommodations when Defendants elect to house them in county jails. Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure, September 16, 2009, at 177–78. The Court stated that Plaintiffs had submitted evidence demonstrating that, pursuant to their authority, Defendants were housing a significant number of persons in county jails, including an average of 480 parolees a day in the San Mateo County Jail, an average of 1,000 parolees a day in the Sacramento County Jail, and 770 individu-

als in In–Custody Drug Treatment Program (ICDTP) placements in county jails. *Id.* at 4–5. The Court also held that Plaintiffs had submitted sufficient evidence that class members being housed in county jails were not receiving accommodations to which they were entitled. *Id.* at 9–10. Accordingly, the Court entered an order requiring that Defendants, within thirty days, submit a plan "for ensuring timely and appropriate accommodations for *Armstrong* class members in county jails[.]" *Id.* at 11. The September 16 Order provided Defendants with flexibility to devise the specifics of the plan, but also required that the plan contain certain elements. *Id.* at 11–14. The Court also found, pursuant to requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A), that the relief it ordered was "narrowly drawn, extend[ed] no further than necessary to correct the violation of federal rights, and [was] the least intrusive means necessary to correct the violation of the federal rights[.]" *Id.* at 11.

Defendants appealed this Court's September 16 Order. Nonetheless, on October 15, 2009, as required by the September 16 Order, Defendants provided "written notification and instruction to all county jail facilities of their duty to comply with the ADA in housing *Armstrong* class members and that defendants will enforce those obligations." September 16 Order, at 11.

On April 1, 2010, after negotiations between the parties, Defendants issued their County Jail Plan, entitled the "County Jail Accommodation Process," in a further effort to comply with the September 16 Order.

On September 7, 2010, 395 Fed.Appx. 365 (9th Cir.2010), the Ninth Circuit affirmed in part and vacated in part the September 16 Order, and remanded the case to this Court for further proceedings. The Ninth Circuit affirmed this Court's holdings that "defendants are responsible for providing reasonable accommodations to the disabled prisoners and parolees that they house in county jails." *Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1063 (9th Cir.2010). The Ninth Circuit held that: (1) the validly enacted ADA Title II regulations provide that "a public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, discriminate against individuals with disabilities[,]" *id.* at 1065 (quoting 28 C.F.R. § 35.130(b)(1)); (2) the ADA requires that when Defendants house state prisoners and parolees in county jails, the state is responsible to ensure that the state prisoners and parolees with disabilities can access the county jails' benefits and services "to the same extent that they are provided to all other detainees and prisoners," *id.* at 1068; (3) neither principles of federalism nor deference to correctional authorities nor the Prison Litigation Reform Act prohibited this Court's order requiring that when Defendants "become aware of a class member housed in a county jail who is not being accommodated, they either see to it that that jail accommodates the class member, or they move the class member to a facility ... which can accommodate his needs[,]" *id.* at 1069, or that when Defendants "become aware of a 'pattern' of ADA noncompliance, they are to notify county jail officials and take steps to remedy the pattern of noncompliance[.]" *Id.* at 1069–1070.

Although the Ninth Circuit affirmed this Court's rulings on the requirements of the ADA, it ruled that the system-wide scope of relief ordered required development of additional evidence concerning the nature and extent of the violations. *Id.* at 1063, justify the scope of September 16 Order, the Ninth Circuit stated that this Court failed to identify any "past determinations that show that class members housed in county jails are not being accommodated ... and thus, we are required to conclude,

did not rely on them when determining the scope of its order." *Id.* at 1073. The Ninth Circuit reversed the September 16 Order and remanded to this Court "to allow it to take such additional evidence as may be necessary concerning the nature and extent of the violations of class members' rights taking place in the county jails." *Id.* at 1073. The Ninth Circuit described Plaintiffs' evidentiary burden on remand as "far from insurmountable" and explained that "in light of the State's failure to track many of the class members that it houses in the County Jails, not much more evidence than that already provided may be required to approve the [September 16 Order]." *Id.* at 1074.

On October 1, 2011, state legislation commonly known as the prison "realignment" law went into effect. Under realignment, parolees who were already placed on state parole prior to October 1, 2011 remain under the supervision of Defendants. Cal.Penal Code § 3000.09(b). Further, persons released from state prison on or after October 1, 2011, who fall into certain categories, including conviction of serious or violent felonies, continue to be placed on state parole under the jurisdiction and supervision of Defendants. Cal.Penal Code § 3000.08(a), (c). Under realignment, low-level offenders who are released from state prison on or after October 1, 2011 and do not fall into the above-mentioned categories are instead supervised on release by counties under the newly created Post–Release Community Supervision program. Cal.Penal Code § 3000.08(a), 3451.[5] Realignment also amended Penal Code section 3056, which now provides, in relevant part:

> Prisoners on parole shall remain under the supervision of the department. . . .

[U]pon revocation of parole, a parolee may be housed in a county jail for a maximum of 180 days. When housed in county facilities, parolees shall be under the legal custody and jurisdiction of local county facilities. When released from custody, parolees shall be returned to the parole supervision of the department for the duration of parole.

Cal.Penal Code § 3056(a).

Plaintiffs have submitted evidence that there are currently over 100,000 parolees under Defendants' supervision. Grunfeld Reply Decl. ¶ 25, Ex. O. In February 2011, Defendants classified approximately seven percent of the incarcerated population as individuals with disabilities, excluding learning disabilities and mental health concerns. Grunfeld Decl. ¶ 53. According to Defendants' own estimates, approximately half of the individuals released from prison in the state after October 1, 2011 will be placed on state parole under the jurisdiction and supervision of Defendants. Grunfeld Decl. ¶ 43, Exs. FFF, HHH. Defendants also project that thousands of parolees will be housed in county jails on a daily basis. *Id.*

## DISCUSSION

Defendants now no longer dispute that "California state prisoners and parolees with mobility, sight, hearing, learning and developmental disabilities" are not being provided proper accommodations while housed at county jails or that they are suffering harm as a result. Defendants also do not dispute that these parolees do not have access to a proper grievance system. Instead, Defendants primarily argue that, under the realignment statute, state parolees are no longer members of the

---

**5.** Plaintiffs state that their present motion is not meant to encompass individuals in the PRCS program, and is limited to state prisoners and state parolees. Accordingly, the Court limits its analysis and does not consider Defendants' responsibility to individuals in the PRCS program, who are housed in county jails.

*Armstrong* class when they are housed in county jails and thus that the proposed injunction is broader than necessary to accommodate the needs of class members. Defendants also contend that the proposed injunction would violate the federalism principles set forth in *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), and that the relief requested here concerns the same issues being litigated in other pending federal class action cases, so this Court should abstain from exercising jurisdiction here.

## I. Responsibility for Providing Accommodations in County Jails

The Ninth Circuit has held that, under the ADA and the Rehabilitation Act, Defendants have the legal responsibility to ensure ADA-compliant conditions for *Armstrong* class members whom they house in county jails. *Armstrong,* 622 F.3d at 1068, 1074.

Defendants rely heavily on sections of the California Penal Code that have not yet gone into effect. As these codes sections are currently written, after July 1, 2013, control over parole revocation proceedings and decisions will transfer from Defendants to local courts, although Defendants will continue to supervise parolees. However, this Court must apply the law currently in effect and will not speculate as to what effect, if any, potential changes to the applicable laws may have on its rulings in the future.

Defendants do not dispute that they continue to have responsibility for certain groups of state prisoners and parolees housed in county jails: those already there "as of October 1, 2011 pending parole revocation proceedings, offenders sentenced to life terms who may return to state prison, and state inmates housed in county jail for county proceedings." Opp. at 6. Defendants also not dispute that they continue to house substantial numbers of CDCR prisoners and parolees pursuant to various contracts and other arrangements. These include contracts with Alameda and Sacramento Counties that Defendants renewed only months before the realignment statute went into effect and that provide for payments to those counties of up to $160 million over the next five years to house as many as 1,150 state inmates per day. *See* Grunfeld Decl. ¶ 38, Ex. DDD; Grunfeld Reply Decl. ¶ 33, Ex. Q. Defendants also contract with a number of counties to house state prisoners in jail-based ICDTPs. Grunfeld Decl. ¶ 33, Exs. MM, OO. *See also* Cal.Penal Code § 4115 (local counties "may enter into a contract with the Department of Corrections and Rehabilitation to house inmates who are within 60 days or less of release from the state prison to a county jail facility for the purpose of reentry and community transition purposes"). Defendants do not dispute that they are still empowered, under various code sections, to hold local county jails accountable for not adhering to minimum standards prescribed by Defendants. *See, e.g.,* Cal.Penal Code § 4016.5 (allowing Defendants to withhold reimbursements to counties for housing certain state prisoners if the county's "facilities do not conform to minimum standards for local detention facilities" and the county fails to make reasonable efforts to correct the violations); Cal. Gov.Code § 76101 (providing that any jail or addition "constructed with moneys from the Criminal Justice Facilities Construction Fund shall comply with the 'Minimum Standards for Local Detention Facilities' promulgated by the Board of Corrections").

Defendants disclaim responsibility for state parolees who are taken into custody for alleged parole violations or whose parole is revoked and who are housed in county jails. They argue that state law now provides that these state parolees are to be housed in county jails and that,

during the time of such incarceration, the county has custody and jurisdiction over these state parolees. Defendants aver that this relieves Defendants of responsibility toward those who may be *Armstrong* class members. *See* Cal.Penal Code § 3056(a).

However, as prior to the enactment of the realignment statute, state parolees housed by Defendants in county jails are in the custody and control of the county, while simultaneously in the continuing custody and control of Defendants. *See, e.g., Samson v. California,* 547 U.S. 843, 851, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (noting, prior to realignment, that "an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term"). As before the realignment statute went into effect, Defendants continue to maintain control and authority over whether the state parolees under their supervision are to be taken into custody and placed into a county jail. Parolees are placed into county jails by virtue of their status as state parolees and do not cease being state parolees while they are also county jail inmates. Defendants BPH and Brown continue to be the only ones able to place a parole hold on a parolee and to have the parolee taken into custody for an alleged violation of parole terms without being eligible for bail. Cal.Penal Code §§ 3056, 3062; *In re Law,* 10 Cal.3d 21, 24–26, 109 Cal.Rptr. 573, 513 P.2d 621 (1973). Under Defendants' implementing policies, county jails are not typically permitted to turn away parolees who have been medically cleared and whom Defendants bring to the county jails, but if they do so, Defendants must "maintain custody" of the parolee while Defendants determine how to resolve the situation. Grunfeld Reply Decl., Ex. K at 4. State law does not appear to prevent Defendants from then placing the parolee in a different county jail. Further, under Defendants' policies,

when county authorities release a parolee before revocation processing is complete, Defendants retain the discretion to return the parolee to custody or to allow the parolee to remain in the community. Grunfeld Reply Decl., Ex. L at 4. Under current law, Defendants BPH and Brown alone have the authority to adjudicate whether a parolee has in fact violated his parole or to decide his sanction, including detention in a county jail. Cal.Penal Code §§ 3000(b)(8), 3000.09(d), 3060, 3062. State law does not mandate this sanction, and it does not designate the particular county facility where the parolee is to be held; these are decisions left to Defendants, who can choose to transfer parolees away from facilities that unable to meet their needs. Defendants also continue to compensate counties for housing state parolees in county jails during the revocation process and during the term of the revocation, now through the use of newly established Local Community Corrections Accounts, which compensates a county based on the number of prisoners that the county is expected to supervise and house, an amount that thus could be reduced if Defendants chose to house parolees in other county jails instead. Cal. Government Code §§ 30025, 30029(c). The fact that state parolees are under the control and custody of the county, as well as of Defendants, during the time of their incarceration does not relieve Defendants of their independent obligations and responsibilities toward to these individuals. *See Armstrong,* 622 F.3d at 1072.

Accordingly, Defendants continue to house state prisoners and parolees in county jails pursuant to their authority under both contracts and state law, as they did at the time of the Ninth Circuit's earlier opinion in this case. Thus, as the Ninth Circuit previously held, Defendants are obliged to ensure ADA-compliant conditions for the prisoners and parolees that

they house under their own authority in county jails.

## II. Evidence of Violation of Class Members' Rights

■ Plaintiffs' evidence demonstrates that, both before and after Defendants issued the County Jail Plan, *Armstrong* class members have suffered significant violations of their ADA rights while housed in county jails. Plaintiffs submitted substantial evidence, including more than sixty declarations from class members, demonstrating that class members in jails throughout the State are injured and are denied access to housing, programs, and services because of Defendants' failure to accommodate their disabilities.[6] Although Defendants again disclaim their responsibility toward these individuals as discussed above, Defendants do not dispute that these violations are still occur-

ring more than a decade after this Court first found that Defendants were failing to accommodate the needs of class members in County facilities. The overwhelming and disturbing evidence is summarized below.

Class members with mobility impairments were denied assistive devices, or had assistive devices taken away from them, while housed in county jails, even though Defendants had previously determined the assistive devices were necessary for the class members to access programs and services while in custody. Class members were not provided with accessible housing, making it difficult and dangerous for them to access their beds, toilets, showers, chow halls, exercise yards, meetings with attorneys, and parole proceedings. One class member was forced to sleep on the floor for sixteen nights. Other class members crawled or limped in

---

**6.** In their reply, Plaintiffs clarified that the county-based Post–Release Community Supervision (PRCS) program was not covered by the instant motion. On October 20, 2011, a week after Plaintiffs filed their reply, Defendants filed objections to the declarations that Plaintiffs had submitted with their opening brief and with their reply. Defendants challenged the admissibility of the declarations on the grounds that the declarants do not make clear what their commitment offenses were and thus if they are state parolees or part of the PRCS program. However, under the provisions of re-alignment, the declarants could not be part of the PRCS program. Each declarant attests that he or she was on parole prior to October 1, 2011. Under state law, the PRCS program only began prospectively on that date; that is, state law provides that those already on parole prior to October 1, 2011 are not eligible to participate in it. Cal.Penal Code § 3451(a).

Four days later, on October 24, 2011, without seeking leave of Court to do so, Defendants filed further objections to the evidence that Plaintiffs had submitted with their reply. Civil Local Rule 7–3 allows a party, without seeking prior Court approval, to file a single document objecting to new evidence submitted with a reply within seven days after the

reply is filed. *See* Civil Local Rule 7(d). Defendants' supplementary objections were untimely and unauthorized by Local Rule 7–3, because Defendants had already filed an objection to Plaintiffs' reply evidence.

In this document, Defendants argue that evidence Plaintiffs offered with their reply, including eight additional declarations, should not be considered, as it was "procedurally improper" to offer it in this way. It is true that "[u]nder such circumstances, the court has discretion to 'decline to consider' the new evidence." *Mercado v. Sandoval,* 2009 WL 2031715, at *1, 2009 U.S. Dist. LEXIS 63267, at *6 (E.D.Cal.). Unlike in the cases cited by Defendants, however, Defendants here have had the opportunity to address this new evidence at a subsequent hearing. *See, e.g., Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1031 (9th Cir.2001). Accordingly, the Court overrules Defendants' objections to the reply evidence submitted by Plaintiffs, because the objections were submitted in violation of Local Rule 7–3 and because Defendants had the opportunity to respond to this evidence at the hearing.

pain to hearings and meetings in county jails. Still others received wheelchairs while in revocation hearing rooms, but not in transit to and from those same hearing rooms. A class member housed at the Yuba County Jail had his wheelchair taken away and not returned, and was unable to shower as a result. This also happened during the same class member's separate stay at the Sutter County Jail. Both jails informed this prisoner that there was no appeals process. Another class member with a mobility impairment being held at the San Francisco County Jail was initially informed by an officer that he could not use his wheelchair to travel long distances, despite a written verification from his doctor. The jail refused to allow this prisoner any assistive devices inside his cell, which sometimes required him to hop around his cell. He had to sleep on a mattress on the floor for approximately seven days because the jail would not provide him with a lower bunk. Staff at Stanislaus County Jail took away the wheelchair of a parolee who required it to travel more than ten feet. As a result, another prisoner was required to hold him up and help him to the shower. The prisoner was told there was no appeals process at the jail. Similarly, staff at the Alameda County Jail in Santa Rita denied a wheelchair to another prisoner with a severe mobility impairment, making it painful and difficult for him to get around. Jail staff also failed to provide him with a shower chair, which made it difficult and dangerous for him to shower. Staff at Sonoma, Sutter, and Sacramento County jails have removed canes from class members, making it painful and hard for them to walk distances, shower, and go up and down stairs.

Class members with hearing and vision impairments did not receive accommodations necessary for effective communication while housed in county jails. Sign language interpreting services were not regularly available to class members housed in county jails. Class members with hearing impairments were not provided with sign language interpreters for important medical and mental health care appointments, which impeded or obstructed their access to those services. One parolee with severe hearing loss was provided with a sign language interpreter only once in the seventy-five days he was at the Santa Rita jail, and went to medical appointments on three or four occasions without being provided access to a sign language interpreter.

Deaf class members could not access the telecommunications devices for the deaf (TDD/TTY telephones) they need to prepare their defenses and communicate with family and the outside world. Because the Santa Rita TDD/TTY telephone was broken, a deaf parolee was only able to use the telephone three times in the seventy-five days he was in the jail. Another deaf parolee had a similar experience at Santa Rita.

A class member housed by Defendants at the Los Angeles County Jail's Twin Towers facility was not provided with a sign language interpreter for medical visits or psychiatric appointments, despite his request for one. A deaf parolee housed at the San Diego Jail was also denied a sign language interpreter for medical and dental appointments. Because some officers did not know this prisoner was deaf, officers would "get mad" at him when he did not respond to verbal commands. This prisoner missed meals, yard, appointments, and canteen call because he was unable to hear the events announced over the loudspeaker and no one notified him of the events. He was also unable to participate in psychiatric treatments and therapy groups and had trouble communicating with jail staff about his need for the TDD/TTY telephone. A blind class member

was denied a tapping cane at the San Francisco County Jail.

*Armstrong* class members housed in county jail are frequently forced to rely upon other prisoners to help them access programs and services as a result of the failure by Defendants and the county jails to provide reasonable accommodations. Reliance on other prisoners for access to basic services, such as food, mail, showers and toilets by prisoners with disabilities leaves them vulnerable to exploitation and is a dangerous correctional practice.

Class members do not have access to functional and timely grievance procedures at county jails to request and obtain disability accommodations. As noted above, at some jails, class members were informed that no grievance procedure exists. At other jails, class members were able to submit grievances but never received a response or did not receive a response in a timely manner.

III. Defendants' Failure to Address System-wide Violations

■ Plaintiffs contend, and Defendants do not dispute, that Defendants' efforts to comply with the ADA, the Rehabilitation Act and prior orders of this Court, and to provide accommodations to class members housed in county jails, have been wholly inadequate and ineffective on a system-wide level, resulting in widespread and continuing violations of class members' rights as described above. The Court finds it troubling that Defendants continue to oppose Plaintiffs' request for relief while apparently recognizing that all of the evidence demonstrates that it is needed.

Although Defendants have developed a computerized, real-time system called the Disability and Effective Communication System (DECS) for tracking disabilities and effective communication needs of prisoners housed in CDCR prisons and on parole, Defendants still have not developed any system, electronic or otherwise, for identifying or tracking such disabilities and needs of CDCR prisoners housed in county jails and facilities. Defendants still do not know the specific location at which those class members are housed, and what accommodations in housing, programs, services, and effective communication those class members require.

The contracts between Defendants and Alameda and Sacramento Counties for the housing of CDCR prisoners in those jails violate the March 21, 2001 Permanent Injunction because they do not include the following provision or one substantially similar, as required by Paragraph 8 of the Injunction: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.*, which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

Defendants also contract with several counties to provide drug counseling in lieu of parole revocation through the In–Custody Drug Treatment Program (ICDTP). *Armstrong* class members continue to have only limited access to ICDTPs offered at county jails because several of Defendants' ICDTP contracts violate the ADA through their Local Jail Exclusionary Criteria which ban persons with disabilities from participation. Defendants' own tracking system shows that one parolee in a wheelchair was rejected from the ICDTP due to a mobility impairment. Another parolee's file indicates that the fact that he is in a wheelchair may limit his ICDTP-jail placement.

The County Jail Plan as drafted and implemented by Defendants has been inadequate and ineffective in remedying the ongoing violations of the rights of class members housed in county jails. It is

troubling that Defendants do not defend the sufficiency of the Plan in any way or show that they have properly implemented even the basic mandates of their own Plan. Defendants also do not respond to the declarations that demonstrate that class members continue to suffer harm after their Plan was purportedly "operating appropriately." The Plan does not have any provision for Defendants promptly to provide the County Jails with information about previously-identified disabilities or necessary accommodations for class members housed in county jails. It also does not have any provision for Defendants to determine whether a CDCR prisoner or parolee who is housed at a county jail requires any accommodations. In the Plan, Defendants elected to rely on the existing grievance procedures available at the county jails, but failed to confirm that the county jails' grievance procedures were adequate or appropriate as written or in practice. Defendants do not monitor grievances of class members in the county jails or have a means for providing to Plaintiffs' counsel a copy of every disability-related grievance filed by an *Armstrong* class member housed in a county jail.

Defendants' County Jail Plan is, on its face, insufficient to ensure the accommodation of class members housed in county jails. Only a single provision in the Plan- that Division of Adult Parole Operation (DAPO) and BPH employees must contact the county jail if a parolee held in the jail pending revocation requests an accommodation or if the employees observe or become aware of the need for an accommodation—might result in the accommodation of a class member who otherwise would not be accommodated while in county jail. The County Jail Plan does not, however, require that Defendants' staff do anything to verify that class members are in fact being accommodated by the county jails. Nor it does it provide for Defendants to share information regarding class members' disabilities and accommodation needs with the county jails, even though Defendants have a computerized tracking system—DECS—dedicated to that purpose. The County Jail Plan also has no provisions whatsoever that could result in the accommodation of class members housed in county jail who are not parolees pending parole revocation. This include parolees serving their revocation terms, CDCR prisoners who are "out-to-court," and prisoners at jail-based In–Custody Drug Treatment Programs. The Plan does not even provide that these class members may be moved away from a facility that is unable to meet their needs.

The evidence shows, and Defendants do not dispute, that Defendants rarely comply with the provision of the County Jail Plan requiring them to request disability accommodations from county jails on behalf of class members. Out of many thousands of BPH Form 1073 documents completed over the past year, only a handful reflect appropriate follow-up by CDCR officials with knowledge of a class member's disability needs.

Moreover, Defendants substantially delayed the implementation of critical provisions of their County Jail Plan. For example, the County Jail Plan explicitly provides that BPH would modify the BPH 1073 form to create a space for Notice Agents, and other staff who interact with CDCR prisoners in county jails, to indicate when they had contacted county jail staff, to request an accommodation for a class member. Defendants took more than six months to modify the electronic version of the BPH 1073 form and took more than thirteen months to modify the paper version of the form. DAPO never trained its staff regarding how to use the new functionalities of the revised electronic BPH 1073 form.

Defendants do not dispute that they have failed to provide appropriate training and supervision for the staff responsible for implementing the County Jail Plan. Defendants did not effectively monitor or supervise their own employees to determine if they were complying with the Plan or whether the Plan was effective in assuring that class members were receiving accommodations while housed in county jails. BPH waited more than two and a half months after the Plan was purportedly implemented even to inform its staff of their obligations under the Plan. Despite the Plan's reliance on the Correctional Standards Authority (CSA) to "monitor this matter" and describe "problems," Defendants did not even inform the CSA that the final County Jail Plan had been issued, much less instruct the CSA to monitor for ADA compliance. No monitoring by the CSA has occurred.

Defendants have abdicated their responsibility for accommodating *Armstrong* class members to the county jails. Defendants possess little to no knowledge regarding whether the county jail facilities in which they house *Armstrong* class members are physically accessible to wheelchair users. Defendants' knowledge of the wheelchair accessibility of the county jails is derived from a 2007 survey whereby Defendants sent a letter to the counties requesting that they self-report the accessibility of cells in their jails. Defendants then compiled the answers that they received into a single document. In its final form, the survey results lacked information for many of the county facilities. Moreover, Defendants never endeavored to confirm that the information provided to them by the counties was accurate. Defendants are aware of court orders and litigation pending against Orange and Los Angeles Counties regarding the inadequacy of their wheelchair accessible housing. Defendants are also aware that certain facilities in San Diego County lack wheelchair accessible housing. Yet Defendants have taken no steps to ensure that *Armstrong* class members are protected when housed in those counties.

Defendants do not dispute that they have not taken any steps to investigate the allegations of ADA violations made in the declarations of *Armstrong* class members housed in county jails that Plaintiffs have provided to Defendants from September 2009 forward.

Defendants' communication of the County Jail Plan to the counties—in a single letter from CDCR's General Counsel on April 12, 2010—did not adequately convey to the counties their existing obligations under the ADA and Rehabilitation Act. In particular, CDCR's statement in that letter that the County Jail Plan "does not require county jails to change any policies or procedures already in place" renders meaningless any report that Defendants might make to the counties of patterns of ADA non-compliance. Given this statement, any county informed of such a pattern will believe that it is not required to do anything to address or resolve such a pattern. In addition, the evidence shows that Defendants did not follow up with any counties regarding the implementation of the County Jail Plan after that letter.

Defendants have never engaged in any comprehensive effort to verify that the disability-related county jail policies and procedures, including grievance procedures, are adequate to ensure the accommodation of class members. Despite claiming to rely on these policies and procedures as adequate for this purpose, Defendants gathered these policies for only a handful of counties. In February 2011, Plaintiffs provided Defendants with more than 5,000 pages of county disability-related policies and procedures that Plaintiffs had collected through California Public Records Act requests. Defendants do not

dispute that they have done nothing to review or analyze the policies.

The Court adopts the findings and opinions of Plaintiffs' well-qualified expert, Jeanne Woodford, former warden at San Quentin State Prison and former acting Secretary of the CDCR. Ms. Woodford examined a number of disability-related county jail policies and procedures and found many of them to be deficient in their mechanisms timely and effectively to identify, track, and ensure the provision of accommodations to prisoners with disabilities. Defendants have not challenged Ms. Woodford's report or its findings. Ms. Woodford concluded that many counties lack a comprehensive plan describing the basic ADA policies and procedures for their jail systems or have ADA-related policies that are so vague and indefinite as to be almost useless. Ms. Woodford found that many counties had policies prohibiting prisoners from possessing assistive devices, such as canes, walkers, and wheelchairs, based upon unfounded fears about prisoners using assistive devices as weapons. Ms. Woodford also identified a number of counties that lacked timely and effective grievance procedures to provide prisoners a mechanism for seeking accommodations. She further noted that many county jail policies provide for the segregation of prisoners with disabilities from the general population and, by so doing, likely deprive prisoners with disabilities of equal access to programs and services within the jail.

## IV. Scope of Appropriate Relief

Defendants have only identified two objections that Plaintiffs' proposed relief is not narrowly tailored to the violations shown.

■ First, Defendants state that the functions of their agents that are referred to in the proposed injunction "will likely be assumed by various county personnel" at a future date, if further legislative changes take effect, and after that time, they will no longer have representatives regularly visiting county jail facilities. Thus, it would purportedly be unduly burdensome for Defendants to be required to interview those who recently have arrived on a parole hold and to collect grievance forms, should Defendants choose not to rely on the county jail's grievance procedures. However, at the hearing, Defendants acknowledged that their parole agents are currently going to county jails twice per week as part of the parole revocation process. Accordingly, it will not be unduly burdensome for them to perform these tasks during these regular visits. Alternatively, Defendants may avoid performing these tasks if they can certify that the jail has an adequate disability grievance procedure.

Secondly, Defendants argue that system-wide relief is not necessary to address the injuries suffered by the reduced number of class members housed in county jails after October 1, 2011. However, the Court is not persuaded that the number of class members will decrease. Regarding the individuals for whom Defendants do not dispute they have responsibility, Defendants state only that they anticipate the numbers of these individuals will decrease in the future, in part because they may choose to move offenders sentenced to life terms to state prison. Based on this conjecture, Defendants argue that the relief sought will be broader than necessary to protect the remaining individuals. *Id.* Defendants do not address the individuals held in county jails pursuant to contracts, those who are in ICDTPs in county jails or the state inmates housed in county jail for county proceedings. Regarding state parolees, they argue only that these individuals are no longer class members; the Court already held above that they continue to be class members. According to

Defendants' own projections, the numbers of these individuals in county jails will increase under realignment. Thus, the relief is not too broad for this reason.

Further, Defendants do not dispute that there will continue to be class members in county jails. The Ninth Circuit has repeatedly held in prior decisions related to this case that " 'if the injury is the result of violations of a statute ... that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs),' then '[s]ystem-wide relief is required.' " *Armstrong v. Schwarzenegger*, 622 F.3d at 1072–73 (quoting *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir.2001)). Defendants do not dispute that there are currently class members still housed in county jails or that Defendants' system-wide policies and practices have caused, and continue to cause, substantial injury to class members, even if they dispute the size of this group.

Given the ineffectiveness of Defendants' County Jail Plan, Defendants' consequent reliance on the county jails to accommodate *Armstrong* class members, and the deficiencies identified in the disability-related county jail policies and procedures and in certain facilities' housing, the Court finds that the types of ADA violations experienced by the class member-declarants have been, and will continue to be, experienced by many other class members who have been and will be housed in county jails throughout California. The serious violations of the rights of class members while housed in county jails are systemic, persistent, and continuing throughout the State and are directly attributable to Defendants' failure to implement appropriate policies and procedures to identify, track, and accommodate these class members, to communicate appropriate information to the county jails, and to monitor compliance by the county jails. The Court finds that the harm experienced by class members is

caused not only by Defendants' statewide policies (or lack thereof) regarding the housing of *Armstrong* class members in county jails, but also by Defendants' ongoing failure to train, supervise, and monitor CDCR employees and agents concerning their responsibilities, ongoing failure to communicate with county jails regarding the known needs of class members, and ongoing failure to take responsibility for and to assert influence over county jails through contracts, regulations, letters, meetings, or other communications. The Court therefore finds that only system-wide injunctive relief could prevent *Armstrong* class members from experiencing future ADA violations when housed in county jails.

## V. Constitutionality under *Printz v. United States* and *New York v. United States*

■ Defendants repeat an argument previously made and rejected by the Ninth Circuit that the relief sought would "commandeer" them "to enforce federal law," in violation of *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) and *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Opp. at 8–9. Defendants argue that, under realignment, they no longer "choose to house" parolees in county jails, and thus that the relief sought would "require Defendants to ensure ADA-compliant conditions not for class members, but rather for offenders being held under the counties' authority." Opp. at 8.

First, as the Ninth Circuit already recognized, unlike in *Printz* and *New York*, this is not an action by the federal government seeking to commandeer a local entity to carry out a federal obligation; it is instead an action by private parties-parolees who fit the class definition-seeking to enforce their constitutional rights, and

thus these cases are not relevant here. *Armstrong,* 622 F.3d at 1069. Further, as already discussed above, the relief that Plaintiffs seek would require only that Defendants ensure ADA-compliant conditions for state prisoners and parolees who are being held in county facilities pursuant to Defendants' contractual and statutory authority. Thus, the order does not mean that the State would have to ensure that county jails follow federal law, but rather that the State itself must follow federal law. *Id.* at 1069. Accordingly, the proposed injunction does not violate the principles set forth in *Printz* and *New York.*

## VI. Abstention

Defendants state that this Court should decline to exercise its jurisdiction over matters pertaining to county jails because of two class action suits addressing conditions of confinement in particular jails, *Pierce v. County of Orange,* No. 01–00981 (C.D.Cal.)[7] and *Johnson v. Los Angeles Co. Sheriff's Dep't,* No. 08–3515 (C.D.Cal.), a consent decree concerning jail conditions in Santa Clara County, *Padilla v. Ryan,* No. 98–2309 (N.D.Cal.), and a settlement between the U.S. Department of Justice and Alameda County concerning jail conditions.

However, none of these cases upon which Defendants rely counsel abstention in the instant situation. In *Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93 (9th Cir.1982), the Ninth Circuit upheld the district court's dismissal of an action because an identical complaint involving the same parties and issues had first been filed in another court. *Id.* at 94–97. In *Church of Scientology v. U.S. Dep't of Army,* 611 F.2d 738 (9th Cir.1979), the Ninth Circuit recognized that, under comity, a court generally defers to previously

filed litigation, but decided to defer to a subsequently filed case, because that litigation, which presented an identical issue, had already progressed through several substantial litigation steps. *Id.* at 749–50. In *Crawford v. Bell,* 599 F.2d 890 (9th Cir.1979), the court dismissed an individual case where the plaintiff was a class member in an ongoing class action addressing the same issues. *Id.* at 893.

None of the other actions to which Defendants point necessitate abstention in this case. None present the same issues or parties. Each is limited to one or two jails within a single county and was brought against county defendants. None were brought against state defendants or involve state parolees held in jails throughout the State. Further, this action was brought well before any of the other cases and has already required a tremendous amount of litigation prior to this point. Accordingly, this Court does not decline jurisdiction over this matter in light of the cases that Defendants raise.

## CONCLUSION

In order to remedy the ongoing harm to *Armstrong* class members, to ensure that Defendants meet their obligations under the ADA and Rehabilitation Act and prior Court orders, and to enforce the March 21, 2001 Permanent Injunction, and based on the entire record in this action, the Court hereby ORDERS the following relief, all of which it finds is narrowly drawn, extends no further than necessary to correct the violations of federal rights, and is the least intrusive means necessary to correct the violations of the federal rights:

1. Within thirty days of this Order, Defendants shall develop a revised plan for

---

**7.** While Defendants represent that issues similar to the ones at hand are currently being litigated in *Pierce,* a judgment was entered in that case on June 28, 2011 and the only issue presently being litigated is attorneys' fees.

ensuring timely and appropriate accommodations for *Armstrong* class members in county jails that includes, at a minimum, the following elements:

a. On a daily basis, Defendants shall send to each county a list of all *Armstrong* class members being housed in the county jail facilities of that county. For each class member, the list shall include the class member's name, CDCR identification number, CDCR disability placement program classification and all accommodations in housing and programming that the Disability and Effective Communication System (DECS) states the class member receives when in custody in one of Defendants' facilities.

b. Within three business days of the arrival of a prisoner at a county jail facility pursuant to a parole hold, Defendants' agent (whether Parole Agent, Notice Agent, Board Revocation Representative, or other agent) shall check DECS, interview the parolee, and review any available 1073 forms and source documents to determine what, if any, reasonable accommodations in housing, programming, or parole proceedings the parolee requires under the *Armstrong* Remedial Plan, the ADA, and/or the Rehabilitation Act and whether these accommodations have been provided to the parolee by the county jail. If DECS, the file review, and/or the interview show that an accommodation is required and has not been provided, within four business days of the parolee's arrival, Defendants' agent must notify a designated staff member at the county jail facility of the accommodations in housing and programming that the class member requires and must document that notification on an appropriate form such as the BPH Form 1073.

c. Class members housed in county jails must have ready access to disability grievance forms, either the CDCR's Reasonable Modification or Accommodation Request form (CDC 1824) or a separate county jail grievance form. If Defendants elect to utilize the CDC 1824 form in any of the counties, Defendants shall collect the grievance forms from class members no less than twice a week, and shall provide copies to a designated person at the county jail. Defendants shall respond to all grievances within fifteen calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided. If a class member identifies the grievance as urgent or an emergency (*i.e.*, if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding), Defendants shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis. For the first six months in which the plan is in effect, Defendants must produce to Plaintiffs' counsel on a monthly basis all grievances collected by Defendants pursuant to this subsection. Production may shift to two times a year after the first six months.

d. If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, Defendants must certify, within thirty days of the acceptance of their plan, that each such jail's disability grievance policy contains the following elements:

i. Is readily available to all class members housed in that county's jail facilities;

ii. Has an initial response deadline of no later than fifteen calendar days from receipt by the designated jail staff member;

iii. Contains a provision for expediting a response if the appeal alleges a condition which is a threat to the parolee's health or

safety, or is necessary for participation or effective communication in a parole revocation proceeding;

iv. Includes a provision for review of the parolee's request by medical staff, if necessary;

v. Provides a right to appeal denials; and

vi. Requires that a copy of each and every grievance and response be provided to Defendants at the same time it is provided to the *Armstrong* class member.

e. If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, for the first six months in which the plan is in effect, Defendants must produce to Plaintiffs' counsel on a monthly basis all grievances provided to Defendants pursuant to subsection (d)(vi) of this paragraph. Production may shift to two times a year after the first six months.

f. If, either through a grievance or otherwise, Defendants become aware of a class member who is housed in a county jail and not receiving accommodations that he or she requires, Defendants shall immediately take steps with county jail staff to ensure that such accommodations are promptly provided or transfer the class member to a facility that is able to provide accommodations.

g. If Defendants become aware, either through a grievance or otherwise, of a pattern of denials of disability accommodations, such as improper housing and/or denial of assistive devices to class members at a particular county jail facility, or grievance process delays or obstacles, they shall take the following steps:

i. Within five calendar days of becoming aware of the pattern, Defendants shall notify the county jail facility administrator in writing of the issue, providing specific dates and incidents, and demanding that the conduct cease and desist;

ii. At the same time, provide a copy of this notification to Plaintiffs' counsel; and

iii. Assign a staff person to investigate the county jail facility and report back to Defendants within thirty days, with a copy to Plaintiffs' counsel, regarding the pattern and steps to be taken to remedy it, including any available monetary fines and penalties for continued violations.

2. Within forty-five days of this Order, Defendants shall issue the plan in final form and disseminate it to all jail facilities in the fifty-eight counties. Defendants shall also disseminate the plan to all relevant personnel employed by Defendants and conduct training of such personnel on the plan upon its dissemination and thereafter on an annual basis.

3. Defendants shall permit Plaintiffs' counsel to monitor the plan and the accommodations provided to *Armstrong* class members while housed in county jails. Reasonable monitoring shall include, at a minimum:

a. The ability to conduct a sufficient number of tours per year of county jail facilities in which *Armstrong* class members are held to determine compliance with this order;

b. The right during the aforementioned monitoring tours to conduct interviews with county jail staff members and with *Armstrong* class members housed in county jails, and to review all files and documents pertaining to *Armstrong* class members, including class members' jail custody and medical files and jail policies and procedures affecting prisoners with disabilities;

c. The opportunity to review and comment on materials used to train Defendants' staff who work in or with county jails about the ADA, the Rehabilitation

Act, and the *Armstrong* case sufficiently in advance of training sessions and to observe those sessions.

d.  A monthly document production that includes all memoranda, DECS County Jail Accommodations Reports, BPH Form 1073s, tracking logs, and other documents related to the plan.

4.  Pursuant to this Court's March 21, 2001 Permanent Injunction, Defendants must add the following language, or substantially similar language, to any existing or future contracts with a county for the housing of CDCR prisoners, parolees, or supervised releasees in county jails, including Defendants' contracts for the housing of CDCR prisoners in the jail facilities of Alameda and Sacramento Counties and Defendants' contracts with any counties to operate jail-based In–Custody Drug Treatment Programs: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.*, which prohibits discrimination on the basis of disability and with applicable regulations and guidelines issued pursuant to the ADA."

5.  The parties shall agree on a mechanism for promptly addressing concerns raised by Plaintiffs' counsel regarding individual class members housed in county jails and emergencies.

6.  Defendants must present drafts of all plans, policies, and procedures developed pursuant to this Order to Plaintiffs' counsel at least fifteen days in advance of the deadlines.  Both parties must make all possible efforts to resolve any disagreements as to their adequacy.  Defendants shall ensure that staff with sufficient authority to amend and approve procedures attend all meet and confer sessions.  In the event that disagreements cannot be resolved, Defendants shall implement the procedures as written on the date ordered and Plaintiffs' counsel shall file objections

with the Court. The Court will rule on the objections and issue orders amending procedures as necessary.

7.  This Order shall apply to Defendants, their agents, employees, successors in office, and all persons with knowledge of it.  The Court shall retain jurisdiction to enforce the terms of this Injunction.

IT IS SO ORDERED.

OPINION IN SUPPORT OF ORDER DISTRIBUTING AND ENFORCING THE AMENDED COUNTY JAIL ORDER AND PLAN (Docket No. 2161)

Plaintiffs move to enforce the Court's April 11, 2012 Amended Order Granting Plaintiffs' Renewed Motion to Require Defendants to Track and Accommodate the Needs of *Armstrong* Class Members Housed in County Jails, Ensure Access to a Grievance Procedure and to Enforce 2001 Permanent Injunction (the Amended Order).  Defendants oppose the motion. In their opposition, Defendants ask that the Court find the Amended Order unenforceable based on a recent amendment to California Penal Code section 3056 or stay the Amended Order pending resolution of their appeal of it.  For the reasons set forth below, the Court GRANTS Plaintiffs' motion and declines to stay the Amended Order or find it unenforceable.

BACKGROUND

As explained in detail in the Court's prior orders, this lawsuit was originally filed seventeen years ago by disabled prisoners and parolees against the California officials with responsibility over the corrections and parole systems.  The Court sets forth here only the background necessary to this motion.

On May 28, 2009, Plaintiffs filed a Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class

Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure.

On September 16, 2009, this Court held that Defendants are responsible for ensuring that *Armstrong* class members receive reasonable accommodations when Defendants elect to house them in county jails. Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure, September 16, 2009, Docket No. 1587, at 7–9. The Court stated that Plaintiffs had submitted evidence demonstrating that, pursuant to their authority, Defendants were housing a significant number of persons in county jails, including an average of 480 parolees a day in the San Mateo County Jail, an average of 1,000 parolees a day in the Sacramento County Jail, and 770 individuals in In–Custody Drug Treatment Program (ICDTP) placements in county jails. *Id.* at 4–5. Although the Court did not rely on the substantial amount of hearsay evidence submitted by Plaintiffs, the Court held that Plaintiffs nonetheless had submitted sufficient evidence that class members being housed in county jails were not receiving accommodations to which they were entitled. *Id.* at 9–10. Accordingly, the Court entered an order requiring that Defendants, within thirty days, submit a plan "for ensuring timely and appropriate accommodations for *Armstrong* class members in county jails[.]" *Id.* at 11. The September 16 Order provided Defendants with flexibility to devise the specifics of the plan, but required that the plan contain certain elements. *Id.* at 11–14. The Court also found, pursuant to requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A), that the relief it ordered was "narrowly drawn, extend[ed] no further than necessary to correct the violation of federal rights, and [was] the least intrusive means necessary to correct the violation of the federal rights[.]" *Id.* at 11.

Defendants appealed this Court's September 16 Order. Nonetheless, on October 15, 2009, as required by the September 16 Order, Defendants provided "written notification to all county jail facilities of the counties' duty to comply with the Americans with Disabilities Act (ADA) in housing inmates with disabilities" and "that CDCR will enforce this duty." Grunfeld Decl. ¶ 5, Docket No. 1915, Ex. B.

On April 1, 2010, after negotiations between the parties, Defendants issued their first county jail plan, entitled the "County Jail Accommodation Process," in a further effort to comply with the September 16 Order.

On September 7, 2010, the Ninth Circuit affirmed in part and vacated in part the September 16 Order, and remanded the case to this Court for further proceedings. The Ninth Circuit affirmed this Court's holdings that "defendants are responsible for providing reasonable accommodations to the disabled prisoners and parolees that they house in county jails." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir.2010). The Ninth Circuit held that: (1) the validly enacted ADA Title II regulations provide that "a public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, discriminate against individuals with disabilities," *id.* at 1065 (quoting 28 C.F.R. § 35.130(b)(1)); (2) the ADA requires that when Defendants house state prisoners and parolees in county jails, the state is responsible to ensure that the state prisoners and parolees with disabilities can access the county jails' benefits and services "to the same extent that they are provided to all other detainees and prisoners," *id.* at 1068; and (3) neither principles of federalism nor deference to correctional authorities nor the

Prison Litigation Reform Act prohibited this Court's order requiring that when Defendants "become aware of a class member housed in a county jail who is not being accommodated, they either see to it that that jail accommodates the class member, or they move the class member to a facility ... which can accommodate his needs," *id.* at 1069, or that when Defendants "become aware of a 'pattern' of ADA noncompliance, they are to notify county jail officials and take steps to remedy the pattern of noncompliance[.]" *Id.* at 1069–1070.

Although the Ninth Circuit affirmed this Court's rulings on the requirements of the ADA, it determined that, although it was a "close question," Plaintiffs had not presented sufficient evidence to justify the system-wide scope of relief ordered. *Id.* at 1073–1074. The court remanded to allow the development of "additional evidence as may be necessary concerning the nature and extent of the violations of class members' rights taking place in the county jails," and noted that "not much more evidence than that already provided may be required to approve the current order." *Id.* at 1073–1074.

On August 8, 2011, Plaintiffs filed a renewed Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure. Docket No. 1912. With that motion, Plaintiffs submitted additional evidence of violations in county jails and asked the Court to issue an injunction nearly identical to that in the September 16, 2009 Order.

On October 1, 2011, state legislation commonly known as the prison "realignment" law went into effect. In some cases, realignment has transferred responsibility for post-release supervision of former state inmates from Defendants to the counties. Under realignment, parolees who were already placed on state parole prior to October 1, 2011 remain under the parole supervision of Defendants. Cal.Penal Code § 3000.09(b). Further, persons paroled from state prison on or after October 1, 2011, who fall into certain categories, including having been convicted of certain serious or violent felonies, continue to be placed on state parole under the jurisdiction and supervision of Defendants. Cal.Penal Code § 3000.08(a), (c). However, lower-level offenders who are released from state prison on or after October 1, 2011 and do not fall into the above-mentioned categories are instead supervised on release by counties under the newly created Post–Release Community Supervision (PRCS) program. Cal.Penal Code §§ 3000.08(a), 3451.

In addition to changing in some cases whether counties or Defendants were responsible for supervision of individuals after release from state prison, realignment also mandated that state parolees with pending revocation charges or serving revocation terms could not be returned to state prison, with certain exceptions. Specifically, Penal Code section 3056 was amended to read as follows,

> Prisoners on parole shall remain under the supervision of the department but shall not be returned to prison except as provided in subdivision (b) [which allows the return to prison of certain individuals serving life parole terms] or as provided by subdivision (c) of Section 3000.09 [which allows the return to prison of parolees who were pending final adjudication of a parole revocation charge prior to October 1, 2011]. Except as provided by subdivision (c) of Section 3000.09, upon revocation of parole, a parolee may be housed in a county jail for a maximum of 180 days. When housed in county facilities, parolees shall be under the legal custody and jurisdiction of local county facilities. When released from custody, parolees

shall be returned to the parole supervision of the department for the duration of parole.

Cal.Penal Code § 3056(a). Thus, although individuals who were serving life parole terms or those already facing a revocation charge before October 1, 2011 could be returned to state prison for parole violations, other state parolees no longer could be and instead were required by state law to serve such terms in county jails. Realignment did not alter Defendants' ability to house state prison inmates temporarily in county jails during the pendency of state court proceedings, which they refer to as sending inmates "out-to-court."

In opposition to Plaintiffs' renewed motion, Defendants argued primarily that, under the realignment statute, state parolees were no longer members of the *Armstrong* class when they were housed in county jails. Defendants also made arguments related to federalism and abstention. Defendants did not pursue their prior claims that Plaintiffs could not prove that disabled parolees were not being accommodated in county jails.

On January 13, 2012, the Court granted Plaintiffs' renewed motion, Docket No. 1974, and issued an Amended Order granting the motion on April 11, 2012, Docket No. 2034. On April 11, 2012, the Court also denied Defendants' motion to stay. Docket No. 2035. In so ruling, the Court rejected Defendants' argument that section 3056, as then phrased, relieved them of responsibility toward parolees housed in county jails, and held that state parolees are jointly in the custody and control of Defendants and the relevant county during that time. The Court explained that it "declines to read the words 'sole' or 'exclusive' into the text of California Penal Code section 3056 before the words 'legal custody and jurisdiction of local county facilities.' " *Id.* at 2. In rejecting Defendants' argument that the language of section 3056

stating that parolees would be "returned to the parole supervision of the department" after being released from a county jail meant that parolees had left Defendants' "custody and jurisdiction" when they entered the county jail, the Court stated in part,

> Contrary to Defendants' characterization, the word "supervision" does not have the same meaning as "jurisdiction." The clear meaning of the statutory text stating that "parolees shall be returned to the parole supervision" of the state is simply that parolees are not terminated from parole when they violate the terms of their supervision and serve a revocation term in county jail, but instead must continue on parole supervision afterwards.

*Id.* at 2. Further, the Court noted,

> Defendants point to no part of state law that restricts their discretion in determining in which county jail they may house that parolee. State law does not appear to require Defendants to choose to house parolees with disabilities in county jails that do not provide adequate accommodations to them.

*Id.* at 3. The Court also pointed out that Defendants "do not challenge the portion of the Court's order that addressed state parolees and prisoners that are held in county jails for reasons other than section 3056," that they "do not dispute that there are currently class members still housed in county jails or that Defendants' system-wide policies and practices have caused, and continue to cause, substantial injury to class members," and that, even if Defendants were to prevail on appeal, "they will nevertheless be required to formulate a plan to carry out the prescribed injunctive relief for the remaining individuals for whom they are indisputably responsible." *Id.* at 5.

The Amended Order required, among other things, that Defendants "develop a revised plan for ensuring timely and appropriate accommodations for *Armstrong* class members in county jails" within thirty days and disseminate it in final form to the counties and Defendants' personnel within forty-five days. Docket No. 2034, 37, 41. The Amended Order further provided, "The Court shall retain jurisdiction to enforce the terms of this Injunction." *Id.* at 43.

On April 30, 2012, Defendants filed a notice of appeal from the Court's April 11, 2012 Orders. Docket No. 2039.

On May 2, 2012, Defendants filed in the Ninth Circuit an urgent motion to stay the April 11 Amended Order pending appeal. Docket No. 3–1, CA9 Case No. 12–16018. In the motion to stay before that court, Defendants stated that they "do not request a stay of the injunction for state prison inmates temporarily housed in county jails (i.e. 'out-to-court' inmates) or parolees sentenced to life terms, because CDCR has the legal authority to return these individuals to a state prison." *Id.* at 2.

On May 23, 2012, the Ninth Circuit denied Defendants' motion to stay and *sua sponte* expedited the appeal, although it did not change the briefing schedule previously set. Docket No. 6, CA9 Case No. 12–16018. No hearing date had been set at that time.

The parties engaged in a number of meet and confer sessions, many of which were mediated by the Court's expert, to develop a revised county jail plan to comply with the Court's orders. Grunfeld Decl. ¶¶ 2–34. By June 26, 2012, the parties had agreed in substance on a revised plan that was ready to be distributed to Defendants' employees and the counties. *Id.* at ¶¶ 11–13, Exs. H, I.

Under the agreed revised plan, among other things, CDCR would send daily electronic notifications to the counties regarding any newly booked parolees who are *Armstrong* class members, providing information about their disability status and the accommodations previously provided. *Id.* at ¶¶ 11–12, Ex. H, 2. Parole/Notice Agents employed by Defendants, who already meet with parolees as part of a notice of rights process, would ask class members to self-identify any disability needs related to housing and programming, would provide class members with a Reasonable Modification or Accommodation Request CDCR form 1824 and a self-addressed, postage-paid envelope, and inform class members that they could use the form to file a grievance if they are not receiving a housing or programming accommodation in the county jail. *Id.* at 3. They would assist class members in completing the form 1824 if those inmates were unable to do so on their own due to a disability. *Id.* Parole/Notice Agents would also inform class members of and encourage them to use the county jail's grievance process as well if they needed disability accommodations. *Id.* They would tell county jail staff, within four business days after a disabled inmate's arrival at the county jail, of his or her need for an accommodation or a medical or mental health examination and document this communication. *Id.* at 4. A similar process would be implemented for "out-to-court" inmates. *Id.* at 4–5. When Defendants received a CDCR form 1824, they would enter it into a tracking system and respond to it within a certain timeframe, depending on whether or not the issue was deemed to be an emergency. *Id.* at 4. Defendants would notify the involved county of the grievance as soon as possible and no later than three business days after receipt. *Id.* Defendants would also review all grievances to identify patterns of denials of disability accommodations, would notify the involved county's legal counsel

within five days of discovery of such a pattern, would investigate the situation to the extent possible, and would determine what steps, if any, could be taken to remedy the situation. *Id.* at 7.

By late June 2012, Defendants had also developed a schedule to begin implementing the plan by September 1, 2012. Grunfeld Decl. ¶¶ 19–20, Ex. O. The parties discussed how to disseminate the final plan to the counties. On June 28, 2012, Plaintiffs emailed a draft of a proposed joint letter, to be signed by both sides, that would accompany the revised plan when it was disseminated to the counties. *Id.* at ¶ 26, Ex. O. Plaintiffs asked for a conference call with the Court's expert and Defendants to discuss the letter. *Id.* Plaintiffs wrote follow up emails to Defendants on July 2 and 4, 2012 but received no response. *Id.* at ¶ 27, Ex. R.

Meanwhile, on June 27, 2012, the Defendant Governor approved Senate Bill 1023, which further amended Penal Code section 3056 to read as follows,

> Prisoners on parole shall remain under the supervision of the department but shall not be returned to prison except as provided in subdivision (b) or as provided by subdivision (c) of Section 3000.09. *A parolee awaiting a parole revocation hearing may be housed in a county jail while awaiting revocation proceedings. If a parolee is housed in a county jail, he or she shall be housed in the county in which he or she was arrested or the county in which a petition to revoke parole has been filed or, if there is no county jail in that county, in the housing facility with which that county has contracted to house jail inmates. Additionally,* except as provided by subdivision (c) of Section 3000.09, upon revocation of parole, a parolee may be housed in a county jail for a maximum of 180 days *per revocation.* When housed in county facilities, parolees shall be under the *sole* legal custody and jurisdiction of local county facilities. *A parolee shall remain under the sole legal custody and jurisdiction of the local county or local correctional administrator, even if placed in an alternative custody program in lieu of incarceration, including, but not limited to, work furlough and electronic home detention. When a parolee is under the legal custody and jurisdiction of a county facility awaiting parole revocation proceedings or upon revocation, he or she shall not be under the parole supervision or jurisdiction of the department.* When released from *the county facility or county alternative custody program following a period of custody for revocation of parole or because no violation of parole is found, the parolee shall be returned to the parole supervision of the department for the duration of parole.*

Cal.Penal Code § 3056(a) (substantive additions to prior version underlined).

On July 6, 2012, Defendants filed a motion before the Ninth Circuit seeking reconsideration of its denial of their motion to stay and arguing that the June 27, 2012 amendment to Penal Code section 3056 had "unequivocally" established that parolees in county jails are no longer *Armstrong* class members. Docket No. 7, CA9 Case No. 12–16018.

On July 9, 2012, Defendants sent Plaintiffs and the Court's expert a letter stating that they "have no discretion to ignore" amended section 3056 or to "monitor county jail inmates over whom they have no custody, control, or jurisdiction," and that they "believe that the courts would not want the parties to undertake a plan regarding county jail inmates before the Ninth Circuit has the opportunity to review the new law." Grunfeld Decl. ¶ 30, Ex. V. Defendants also stated that they

would "shortly complete a new plan concerning out-to-court state prison inmates and the life-term parolees who can be returned to state prison." *Id.*

On July 10, 2012, the parties conducted their regularly scheduled meet and confer session. Grunfeld Decl. ¶ 31. At that meeting, Defendants stated that they would not be issuing the revised county jail plan to the counties or to CDCR staff in light of revised Penal Code section 3056. *Id.*

On July 12, 2012, Defendants sent an email to all fifty-eight California counties, attaching the revised plan, labeled on each page with the word "draft," and summarizing the status of the appeal. Grunfeld Decl. ¶ 32, Ex. X. In the email, Defendants stated in part,

> While I send you the draft plan, it will not be implemented at this time until we hear whether the renewed request for a stay is granted. If it is granted, we will send out a revised plan which addresses only the population over whom CDCR has continuing authority. CDCR is currently working to develop such a plan.

*Id.* Defendants did not explain what they would do if the stay were denied, as soon happened.

On July 16, 2012, Plaintiffs filed the instant motion, asking this Court to issue an order enforcing the April 11, 2012 Amended Order by requiring Defendants to disseminate to the counties and Defendants' employees the agreed revised plan without a "draft" label, to train their employees in accordance therewith, to implement the plan by September 15, 2012 according to the parties' agreed schedule with minor modifications, and to hire and train sufficient staff to do so. Docket No. 2161.

On July 19, 2012, the Ninth Circuit denied Defendants' motion for reconsideration of the denial of their motion to stay, without prejudice to Defendants raising in their merits briefs any issue raised in the motion for reconsideration. Docket No. 8, CA9 Case No. 12–16018. The Ninth Circuit also shortened the briefing schedule and set a hearing for September 5, 2012.

On July 30, 2012, Defendants responded in this Court to Plaintiffs' motion to enforce. Docket No. 2170. In their opposition, Defendants did not argue that they were in compliance with the Amended Order or indicate that they intended to comply with it. Instead, as noted above, they asked the Court to find that the change in section 3056 had rendered the Amended Order unenforceable. They alternatively asked that the Court stay the Amended Order.

On August 22, 2012, the parties filed a joint case status statement. In the joint statement, Defendants indicated in part,

> Defendants plan to conduct employee training in August 2012, and Plaintiffs' counsel have agreed to attend an August 30, 2012 training session. Defendants also plan to implement an e-mail notification system to the counties by September 1, 2012 of disability related information pertaining to purported class members as of the date they were released from prison.

Docket No. 2181, 21. This indicated that Defendants were prepared to comply in part with the Court's Amended Order.

On August 23, 2012, the Court held a hearing on the instant motion. At the hearing, Defendants affirmed that they intended to comply in part with the Amended Order and to carry out the agreed revised plan in part. Defendants stated that, as of September 1, 2012, they would begin providing email notices to county jails setting forth the disability status and previously provided accommodations for all of the individuals covered in the Amended Order, including parolees subject to section 3056, with copies to Plain-

tiffs' counsel. They further represented that, as of that date, they would implement the remaining provisions of the plan, but as to the "out-to-court" prisoners and life parolees only. Thus, they would give only the "out-to-court" prisoners and life parolees a grievance form and means to return it and they would act upon such forms that they received. Defendants also stated that they would go forward with training their Notice Agents regarding all of the provisions of the revised plan, using training material agreed upon with Plaintiffs on June 13, 2012. Defendants clarified that this training would cover all provisions that pertained to the parolees subject to section 3056 and would not be limited to "out-to-court" prisoners and life parolees.

## DISCUSSION

■ Defendants must obey the Amended Order unless and until this or another court has relieved them of that responsibility, through a stay, reversal or modification of the order. The "established doctrine" is that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania v. Consumers Union of United States*, 445 U.S. 375, 386, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); *see also Wedbush, Noble, Cooke, Inc. v. SEC*, 714 F.2d 923, 924 (9th Cir.1983) ("the mere pendency of the appeal does not, in itself, disturb the finality of the judgment").

■ This Court does not have jurisdiction to decide whether the amendment to section 3056 has rendered the Amended Order unenforceable. "Once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed." *Natural Res. Def. Council v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir.2001) (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982)

(per curiam); *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir.1982)). The purpose of this rule "is to promote judicial economy and avoid the confusion that would ensue from having the same issues before two courts simultaneously." *Id.* (citing *Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir.1983); *Moore's Federal Practice*, § 303.32[1] (3d ed.2000)). This rule "is a creature of judicial prudence, however, and is not absolute." *Masalosalo*, 718 F.2d at 956.

■ This Court does retain "jurisdiction during the pendency of an appeal to act to preserve the status quo." *Natural Res. Def. Council*, 242 F.3d at 1166. *See also Newton v. Consolidated Gas Co.*, 258 U.S. 165, 177, 42 S.Ct. 264, 66 L.Ed. 538 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of justice require, preserve the status quo until decision by the appellate court"). This exception "has been codified in Rule 62(c) of the Federal Rules of Civil Procedure, which allows a district court to 'suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.' " *Natural Res. Def. Council*, 242 F.3d at 1166 (quoting Federal Rule of Civil Procedure 62(c)). The Ninth Circuit has cautioned that the Rule "does not restore jurisdiction to the district court to adjudicate anew the merits of the case" and that any action taken pursuant to it "may not materially alter the status of the case on appeal." *Id.* (citations and quotation marks omitted). *See also McClatchy*, 686 F.2d at 735 (after appeal is filed, the district court "may not finally adjudicate substantial rights directly involved in the appeal") (quotations omitted).

■ Further, although the Court does not have jurisdiction to decide the merits

of the issue that is currently on appeal, "a district court has continuing jurisdiction in support of its judgment, and 'until the judgment has been properly stayed or superseded, the district court may enforce it . . .' " *Resolution Trust Corp. v. Smith,* 53 F.3d 72, 76 (5th Cir.1995) (quoting *Farmhand, Inc. v. Anel Engineering Industries, Inc.,* 693 F.2d 1140, 1146 (5th Cir.1982)). *See also Lara v. Secretary of Interior,* 820 F.2d 1535, 1543 (9th Cir.1987) ("The district court may issue orders pending appeal to enforce its judgment."); *Hoffman v. Beer Drivers & Salesmen's Local No. 888,* 536 F.2d 1268 (9th Cir.1976) ("Where the court supervises a continuing course of conduct and where as new facts develop additional supervisory action by the court is required, an appeal from the supervisory order does not divest the district court of jurisdiction to continue its supervision, even though in the course of that supervision the court acts upon or modifies the order from which the appeal is taken.").

As Plaintiffs point out, the cases that Defendants cite to urge the Court to reexamine the validity of the Amended Order do not compel a contrary conclusion. Two of the cases address the "general rule" that "an appellate court must apply the law in effect at the time it renders its decision," including in situations when the relevant law changed after the trial court rendered its judgment. *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 281–282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). *See also Lambert v. Blodgett,* 393 F.3d 943, 973 (9th Cir.2004) ("it is well established . . . that if the law changes while the case is on appeal the appellate court applies the new rule"). In the other two cases, the district court held that, when a higher court issued new controlling authority while a motion was pending but after briefing was completed, when rendering a decision, the court was required to apply the law as it existed at the time of decision, including the new appellate authority.

*Kwiatkowski v. Dickinson,* 2012 WL 893257, 2012 U.S. Dist. LEXIS 34531, at *12–13 (E.D.Cal.); *DeVries v. Cate,* 2011 WL 2746337, 2011 U.S. Dist. LEXIS 76409, at *8–9 (E.D.Cal.). None of these cases stands for the proposition that a trial court may revisit the legal reasoning underlying an order that is currently on appeal in order to apply new law to it.

Although the Court lacks the jurisdiction to reconsider the Amended Order, the Federal Rules of Appellate Procedure provide a procedure under which a district court could do so. Specifically, Rule 12.1 provides, "If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending," the district court may state "either that it would grant the motion or that the motion raises a substantial issue," in which case "the court of appeals may remand for further proceedings." Federal Rule of Appellate Procedure 12.1(a),(b). Defendants did not make a motion for an indicative ruling from this Court or seek such relief.

■■■■ Finally, however, in considering a request for a stay, the Court can consider the effect of a change in the law when evaluating the likelihood of success on the merits of an appeal. The Court does not find that revised section 3056 renders it likely that Defendants will succeed on appeal. The changes in section 3056 did not affect several of the bases for the Amended Order. Class members are still placed into county jails by virtue of their status as state parolees and they do not cease to be state parolees when they are in county jails. Among other things, Defendants continue to exercise control and authority over the parole revocation process, including investigation and charging parolees with violations, placing parole holds on them, arresting and detaining them, determining how long their revoca-

tion term will last and deciding whether they should be sent to a county jail or subjected to an alternative sanction, such as placement in a community-based program. The Court notes that it has not had occasion to consider whether the amendments to section 3056 were passed in order to evade the state's responsibility for compliance with the ADA and, if so, whether such amendments would be void due to the Supremacy Clause of the Constitution. U.S. Const. art. VI., § 2. This issue has been briefed in the Ninth Circuit, which may make this decision in the course of the pending appeal.

Accordingly, the Court will not find its order unenforceable or stay it but will exercise its retained jurisdiction to enforce its injunction, as Plaintiffs request.

The Court notes that, in this motion, Plaintiffs do not seek to enforce the Amended Order in full but rather only those provisions contained in the agreed revised plan. Thus, Plaintiffs do not seek enforcement of many of the provisions of which Defendants complain. For example, Plaintiffs do not seek to enforce the provision that, if Defendants become aware that a class member is not receiving accommodations that he or she requires, they "immediately take steps with county jail staff to ensure that such accommodations are promptly provided or transfer the class member to a facility that is able to provide accommodations." Amended Order, 40. In this motion, Plaintiffs also do not seek to enforce the provisions that would require Defendants to permit them to conduct monitoring tours of county jail facilities and interview county jail staff members. Accordingly, Defendants' arguments regarding these provisions are irrelevant to the present motion.

■■■ Instead, Plaintiffs seek to require Defendants to carry out the revised plan to which Defendants had previously agreed. The Court has found that such measures were narrowly drawn and were the least intrusive means necessary to correct the ongoing violations of federal rights, substantial evidence of which Plaintiffs previously proffered in support of their earlier motion. The Court further notes that, in conjunction with the instant motion to enforce, Plaintiffs have submitted additional evidence of ongoing harm to class members in county jails.[1] Although Defen-

---

1. Defendants object to Exhibits F through M, Q, R, T and V to the Freedman declaration on the basis that these declarations and letters were written by state parolees and "parolees are not *Armstrong* class members when they are in county jail." Opp. at 16. The Court has already held that state parolees continue to be class members during the time they are held in county jail for parole revocation proceedings or terms. Accordingly, the Court OVERRULES this objection.

Defendants also object to Exhibits E and L through P to the Freedman declaration on the basis that these declarants are county jail inmates who have not established that they are parolees or class members or were not diagnosed with a disability by CDCR and the declarations are therefore not relevant. Opp. at 16. However, even if these specific examples "do not involve class members, they support the inference that county jails do not provide reasonable accommodations for prisoners with disabilities who are class members." Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure, Docket No. 1587, at 10 (citing Federal Rule of Evidence 401). Accordingly, the Court OVERRULES these objections.

Defendants further object to specific statements within Exhibits F, G, I, J, K, L, N, O and Q, as well as the letters submitted as Exhibits R, T and V, as inadmissible hearsay or without foundation. Because the Court would reach the same determination, that the evidence submitted constitutes prima facie evidence of ongoing harm to class members in county jails, regardless of these particular statements, the Court SUSTAINS Defendants' objections.

dants may not have had a full opportunity to investigate and respond to these declarations, they are nonetheless prima facie evidence that class members continue to suffer harm as Defendants delay their compliance with the Court's order.

■ To the extent that, in their opposition, Defendants ask that the Court stay the Amended Order pending the Ninth Circuit's resolution of their appeal, the Court continues in its view that a stay is not warranted considering the merits of the appeal and the balance of hardship. As the Court previously determined, "class members will continue to suffer substantial harm for each day that their disabilities are not accommodated," and this outweighs "the speculative administrative and monetary arguments and evidence" that was previously presented by Defendants. Docket No. 2035, 6. In the instant briefing, Defendants have not raised claims of irreparable harm that they would suffer in the absence of relief.

Defendants do not dispute that they have not disseminated a plan as required by the Amended Order and that they do not intend to implement a plan with all of the elements contained therein. Instead, although they will provide counties with initial notifications of the disability accommodation needs of all of the class members, including those whose status they dispute, they intend to carry out the remainder of their agreed revised plan with respect only to the life parole and "out-to-court" subsets of the class members covered in the Amended Order. The Court also notes that the deadlines contained in the Amended Order for dissemination and implementation of a revised plan have long since passed. Accordingly, the Court concludes that a further enforcement order is necessary to ensure compliance with the terms of the Amended Order and GRANTS Plaintiffs' motion to enforce it. The Court further finds that the relief ordered herein is narrowly drawn, extends no further than necessary to correct the violations of federal rights, and is the least intrusive means necessary to correct the violations of the federal rights found in the Amended Order.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiffs' motion to enforce the Amended Order (Docket No. 2161). The Court ORDERS as follows:

1. Within three (3) business days of the issuance of this Order, Defendants shall disseminate the plan to which the parties agreed on June 26, 2012 (the "County Jail Plan"), a draft copy of which is attached as Appendix A, to all of Defendants' personnel who have responsibility for implementing any provisions of the County Jail Plan. The County Jail Plan disseminated by Defendants shall not indicate that the County Jail Plan is a draft or non-final. Defendants must also inform their personnel with responsibility for tasks described in the County Jail Plan that they will receive training on the elements of the County Jail Plan for which they will be responsible.

2. Within three (3) business days of the issuance of this Order, Defendants shall disseminate the County Jail Plan, without any indication that it is a draft or non-final, to the Sheriffs, County Jail Administrators and County Counsel of each of the fifty-eight counties. A copy of this Court's Order Distributing and Enforcing the Amended County Jail Order and Plan, filed today, shall be disseminated along with the County Jail Plan.

3. Training of all Parole/Notice Agents and interim ADA coordinator(s) or designee(s), using the June 13, 2012 PowerPoint presentation, shall be completed no later than September 15, 2012. Plaintiffs' counsel may attend the training session.

4. On or before September 1, 2012, Defendants shall send an email notification to each county's legal counsel or designee identifying each parolee with a disability, including those subject to California Penal Code section 3056, being held in that county's jail facilities on that date. Beginning on September 1, 2012, Defendants shall send email notifications once per day to each county's legal counsel or designee identifying each parolee with a disability booked in that county's jail facilities over the past 24 hours. The notifications must include each parolee's name, CDCR identification number, and last release date from prison. The notification must also include a plain-language description of each parolee's last-known disabilities and the accommodations in housing or programming the parolee received as of the date he or she was released from prison.

5. On or before September 15, 2012, Defendants shall send an email notification to each county's legal counsel or designee identifying each CDCR out-to-court prisoner with a disability being held in that county's facilities on that date. Beginning on September 15, 2012, Defendants shall send email notifications once per day to each county's legal counsel or designee identifying each CDCR out-to-court prisoner with a disability sent to that county's facilities in the past 24 hours. The notification will include each CDCR out-to-court prisoner's name and CDCR identification number. The notification will also include a plain-language description of the out-to-court prisoner's last-known disabilities and the accommodations in housing or programming the prisoner received as of the date he or she was transferred from a prison.

6. Beginning on September 15, 2012, Defendants shall provide CDCR grievance forms and stamped envelopes addressed to CDCR to all parolees and out-to-court prisoners with disabilities housed in county jails. CDCR personnel shall encourage parolees and out-to-court prisoners also to use the county jail's grievance process to request disability accommodations. Whenever Defendants receive a completed grievance form from a parolee or out-to-court prisoner in county jail, they shall forward the grievance form to the county's legal counsel or designee as soon as possible and no later than three business days after receipt. Defendants shall respond to the grievances within the timeframes set forth in the County Jail Plan.

7. Beginning no later than September 15, 2012, if CDCR personnel become aware that an out-to-court prisoner or parolee with a disability faces an urgent or emergency situation (for example, if there is an allegation of a condition that is a threat to the individual's health or safety or that would prevent his or her participation or effective communication in a parole revocation proceeding), Defendants shall notify the county's designee or legal counsel immediately.

8. Defendants must implement all remaining provisions of the County Jail Plan by September 15, 2012. This includes, but is not limited to, the requirements that they must review and respond to grievances they receive from disabled parolees, promptly share grievances with county officials, review grievances to identify patterns of denials of disability accommodations, and investigate any such patterns identified.

9. Defendants shall train sufficient staff and implement all necessary procedures such that all provisions of the County Jail Plan are operational by September 15, 2012.

IT IS SO ORDERED.