Filed 5/25/22  P. v. Bell CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COREY BELL,<br><br>    Defendant and Appellant. | H047364<br>(Santa Clara County<br> Super. Ct. No. 212285) |

In 2011, plaintiff Corey Bell was arrested while he was on parole.  While incarcerated in county jail on his new criminal charges, Bell signed an "optional waiver" (former Cal. Code of Regs., tit. 15, § 2641, subd. (b))[1] and accepted a 12-month term for his parole violation.  In 2012, after Bell requested a full parole revocation hearing, the Santa Clara County District Attorney's Office filed a petition to commit him under the Sexually Violent Predators Act (SVP Act) (Welf. & Inst. Code, § 6600 et seq.).[2]  A statutory prerequisite to the commencement of SVP proceedings and the filing of a sexually violent predator (SVP) petition is that an inmate must be in custody under the jurisdiction of the California Department of Corrections and Rehabilitation (CDCR) serving either a determinate prison sentence, parole revocation term, or a hold pursuant to section 6601.3.  (§ 6601, subd. (a)(1) & (3).)  On appeal, Bell argues that his SVP

_____

[1] Former California Code of Regulations, title 15, section 2641 was repealed in 2014.

[2] Unspecified statutory references are to the Welfare and Institutions Code.

petition must be dismissed because when the petition was filed, he was not under the CDCR's jurisdiction and was not serving a parole revocation term.

We conclude that under Penal Code section 3000.09 and former California Code of Regulations, title 15, section 2641, subdivision (b), Bell was in custody under the CDCR's jurisdiction and was serving a parole revocation term when his SVP petition was filed. We further conclude that even if we assume that Bell's parole revocation term was unlawful, substantial evidence supports the trial court's conclusion that his custody was the result of a good faith mistake of law (§ 6601, subd. (a)(3)), which precludes the dismissal of the SVP petition. We affirm the judgment.[3]

## I. BACKGROUND

A. *Bell's Parole Violation and the Filing of the SVP Petition*

In 1992, Bell was convicted of several crimes, including sexual offenses and a robbery, and was sentenced to a total term of 32 years in prison.[4] In 2008, Bell was released on parole for a period of approximately three years. In May 2011, while Bell was still on parole, he was arrested for furnishing alcohol to a person under the age of 21, battery with gross bodily injury, sodomy with a non-consenting adult, penetration by a foreign object, and criminal threats, which were allegedly committed in San Mateo County. After his arrest, he was placed on a parole hold pending a revocation hearing. Bell received and acknowledged a notice of his parole violation, and the parole officer

---

[3] After briefing in this case was completed, Bell filed a petition for writ of habeas corpus that this court ordered to be considered with his appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

[4] Bell was convicted of sodomy by force (Pen. Code, § 286, subd. (c)), penetration by a foreign object (Pen. Code, § 289, subd. (a)), forcible oral copulation (former Pen. Code, § 288a, subd. (c)), assault with force likely to produce great bodily harm (Pen. Code, § 245, subd. (a)(1)), and robbery (Pen. Code, §§ 211, 212.5, subd. (b)).

prepared an assessment offer recommending that Bell's parole be revoked and that he be returned to custody for a period of 12 months.

In June 2011, Bell appeared before the Board of Parole Hearings (Board) for a probable cause hearing, signed an "optional waiver," and accepted the assessment offer of 12 months in custody for his parole violation. As part of this waiver, Bell "optionally" gave up his right to a probable cause hearing and a full revocation hearing and reserved the right to request a full hearing no later than 15 days after the adjudication of his pending criminal charges. (Former Cal. Code of Regs., tit. 15, § 2641, subd. (b).) According to the CDCR's "Chronological History" of Bell's case, the Board revoked Bell's parole on June 8, 2011, pursuant to the optional waiver.

In March 2012, Bell requested a formal revocation hearing. During an optional waiver review hearing held that month, Bell elected to sign another optional waiver. Bell's parole remained revoked, and he was returned to custody. Bell's "Chronological History" again reflected that his parole was revoked.

The following month, in April 2012, Bell again requested a full revocation hearing. A parole revocation hearing was scheduled for May 10, 2012. At the time, Bell's criminal charges remained pending. There were no notations in Bell's CDCR "Chronological History" for April 2012 that would indicate any changes to Bell's parole status.

On May 2, 2012, while Bell was housed in the local county jail, the Santa Clara County District Attorney's Office filed a petition to commit him as a SVP under the SVP Act. The petition alleged that Bell was "presently an inmate and in the custody of the California Department of Corrections and Rehabilitation on a parole violation" and was "also presently in custody and physically located at the San Mateo County Jail."

According to an attached declaration, Bell had several qualifying convictions under the SVP Act: (1) a 1988 conviction for committing a lewd and lascivious act with a child under the age of 14 (Pen. Code, § 288, subd. (a)) for which he was ordered to

3

serve six years in prison; and (2) 1992 convictions for sodomy by force (Pen. Code, § 286, subd. (c)) and oral copulation by force (former Pen. Code, § 288a, subd. (c)) for which he was ordered to serve 26 years in prison. Two psychologists had evaluated Bell and found that he met the criteria as an SVP as defined under section 6600, subdivision (a).

On May 16, 2012, Bell's parole violation was dismissed following a hearing. A form summarizing the revocation hearing and parole decision contained the following notation: "Charges dismissed in the interests of justice as PS NLT [(no later than)] was 5-10-12 according to RSTS [(Revocation Scheduling and Tracking System)]. [¶] This is not a dismissal on the merits[.] [¶] P has a current SVP hold from Santa Clara County, plus a hold and the current charges in San Mateo County[.] [¶] P has been in custody since 5-20-11." The form stated that the parole revocation hearing was "6 days overdue." Bell's CDCR "Chronological History" reflected that on May 10, 2012, he was discharged at the "statutory maximum" and that the "previous BPH action of [March 2012 was] rescinded."

In July 2012, the People moved to dismiss Bell's pending criminal charges in San Mateo County after the victim refused to testify, which the trial court granted.

## B. *The First Motion to Dismiss the SVP Petition*

In August 2012, Bell filed a motion to dismiss the SVP petition. Bell argued that because he had invoked his right to a full revocation hearing and the parole violation was subsequently dismissed, his parole had never been revoked. Thus, Bell claimed that the People lacked jurisdiction to proceed with the SVP petition. He also claimed that proceeding on his SVP petition would be a "gross violation of equal protection and due process" because his custody had been the result of a dismissed parole violation and dismissed criminal charges.

The People opposed Bell's motion to dismiss, arguing that the "optional waiver" was "a time waiver only"; thus, Bell's parole was revoked after he signed the optional

4

waiver in June 2011.  Moreover, the parole violation was dismissed for purely technical reasons, and Bell was serving a parole revocation term when the SVP petition was filed.  The pending criminal charges in San Mateo County were dismissed after the victim unexpectedly refused to appear in court and testify against Bell.  The People also argued that former California Code of Regulations, title 15, section 2641, subdivision (b), the regulation describing the optional waiver procedure, was a valid "quasi-legislative" enactment that was promulgated by the Board.

In September 2012, the trial court held a hearing on Bell's motion to dismiss.  CDCR Associate Chief Deputy Commissioner Daniel Moeller testified about the agency's practices and procedures regarding parole revocations.  According to Moeller, once a parolee signs an optional waiver, the CDCR considers the parolee to be "in revoked status at that point," and, in Bell's case, the Board ordered Bell's parole to be revoked after he signed the optional waiver.  Moeller testified that once a parolee activates an optional waiver and requests a full revocation hearing, a full revocation hearing will be scheduled but the parolee is still considered to be in "revocation status." Moeller also referenced a CDCR resource document that stated that " 'upon receipt of [a signed] optional waiver, . . . parole will be revoked for the period indicated on the waiver and revocation return to custody assessment forms.' "

Moeller explained that after an optional waiver is activated, if the parole violation is found not to be true, the violation would be dismissed, and the parolee would no longer be considered in revoked status.  Thereafter, the time that the parolee spent in custody would not be added to his or her parole period, and the parolee would be given credit against the parole period for his or her time in custody.

5

According to Moeller, the "*Valdivia* injunction" requires the Board to hold a revocation hearing within 35 days of when a parolee activates an optional waiver.[5] Moeller interpreted the CDCR's paperwork as reflecting that Bell's revocation hearing should have been held no later than May 10, 2012, based on the timeframes described in the *Valdivia* injunction. Moeller also testified that the CDCR's written notes, which reflected that Bell was discharged from parole on May 10, 2012, should have reflected that he was discharged from parole on May 16, 2012, the date that his parole violation was dismissed. And, based on Moeller's interpretation of former California Code of Regulations, title 15, section 2641, subdivision (b), Bell "remained in revoked status" until May 16, 2012.

Moeller testified that Bell could have chosen a "true time waiver" on the same form where he signed his optional waiver. If Bell had elected to enter a "true time waiver," the CDCR would not have been required to hold a hearing within the 35 days as mandated under the *Valdivia* injunction, and Bell's parole would have remained unrevoked.

Department of Mental Health Staff Services Manager Karen Gillham also testified at the hearing. Gillham testified that when she receives documentation from the Board that a parolee has signed an optional waiver, she generally perceives this to be a determination that the parolee's parole has been revoked and the Department of Mental Health can move forward with initiating proceedings under the SVP Act.

The parties stipulated that a third witness, CDCR Deputy Commissioner Jeff Champlin, would have testified that he was not required to dismiss Bell's parole violation and could have proceeded with the parole revocation hearing.

---

[5] In 2004, a federal injunction was entered requiring parole revocation hearings be held no later than 35 calendar days from the date of placement of a parole hold. (*Valdivia v. Brown* (2013) 956 F.Supp.2d 1125, 1128-1129.)

At the hearing, Bell argued that a parole "revoked" status can take on different meanings, including whether parole is revoked after a probable cause finding or a "full revocation" after a revocation hearing. Bell claimed that the CDCR or the district attorney could not rely on the language of former California Code of Regulations, title 15, section 2641, subdivision (b) to proceed with SVP proceedings, and there was neither "good cause nor good faith mistake" involved with the filing of the SVP petition in his case. Moreover, Bell argued that maintaining the SVP proceedings against him would violate principles of equal protection as described in *In re Smith* (2008) 42 Cal.4th 1251 (*Smith*).

The People argued that the evidence at the hearing reflected that once a parolee signs an optional waiver, his or her parole is revoked. Thus, Bell was in "full parole revoked status based on CCR 15 2641" when the SVP petition was filed. The People also argued that former California Code of Regulations, title 15, section 2641 was a valid regulation, and there was no equal protection violation because he was on parole. Moreover, the evidence was that the CDCR and the Department of Mental Health relied on former California Code of Regulations title 15, section 2641 to initiate SVP proceedings, and former California Code of Regulations title 15, section 2641 had largely remained "unchallenged" since its promulgation. Accordingly, the good faith mistake provision precluded dismissal of the SVP petition.

After considering the evidence and the parties' arguments, the trial court found the People's arguments to be persuasive and denied Bell's motion to dismiss. The trial court agreed with the People that former California Code of Regulations, title 15, section 2641 was "a valid and quasi-legislative action that is appropriate." The trial court also noted that even if the regulation was invalid, "there [was] ample showing of good faith and reliance on that which has been in existence for a significant period of time."

7

C. *The Second Motion to Dismiss the SVP Petition*

In March 2013, Bell filed a second motion to dismiss the SVP petition. In his motion, Bell argued that he had recently subpoenaed documents from the CDCR that demonstrated that his parole had not been revoked when the SVP petition was filed. The document referred to by Bell was a memorandum from the Board of Parole Hearings' Chief Field Operations that stated: "When an Optional Waiver is accepted, the parolee is placed in revoked status until or unless revocation proceedings are re-opened." Based on the language of this memorandum, Bell claimed that his parole was no longer revoked after he requested a full revocation hearing.

The following month, the trial court held a hearing on the motion to dismiss, which it characterized as a motion to reconsider its earlier ruling denying Bell's first motion to dismiss. After finding that the issues raised in the motion had already been litigated, the trial court denied the motion.

D. *The Third and Fourth Motions to Dismiss the SVP Petition*

In April 2013, the trial court found there was probable cause that Bell met the criteria for being an SVP as defined under the SVP Act. More than two years later, in November 2015, Bell filed two additional motions to dismiss based on the trial court's alleged lack of jurisdiction. In January 2016, the trial court denied both motions to dismiss after concluding that the issues had already been litigated and, if considered to be motions for reconsideration, that the motions were both untimely.

E. *The Hearing on the SVP Petition*[6]

In 2019, the trial court held a hearing on the SVP petition. Three hospital workers testified about Bell's behavior while he was at Coalinga State Hospital. In one incident, there was a physical altercation between Bell and another patient. In another incident,

_____

[6] Bell does not challenge the sufficiency of the evidence introduced at the hearing on the SVP petition. Accordingly, we provide only a brief summary of the relevant facts.

8

there was blood and fecal matter found in a stairwell, and another patient was found bleeding and shaking nearby. Bell ran away from officers when they contacted him about this incident, but officers found no physical evidence on Bell. Finally, there was another physical altercation between Bell and another patient, but it was unclear if Bell threw the first punch during the fight.

Two psychologists, Dr. Douglas Korpi and Dr. Christopher Matosich, testified as experts in diagnosing and treating mental disorders. Both psychologists opined that Bell met the criteria as an SVP under the SVP Act. Dr. Korpi diagnosed Bell with antisocial personality disorder. Dr. Matosich diagnosed Bell with sexual sadism, antisocial personality disorder, and alcohol dependency.

In August 2019, the trial court found Bell to be an SVP and committed him to an indeterminate term. Bell filed a timely notice of appeal.

## II. DISCUSSION

### A. *Jurisdiction to Proceed on the SVP Petition*

Bell argues that the trial court erred when it denied his multiple motions to dismiss the SVP petition because when the petition was filed, he was not in custody under the CDCR's jurisdiction and was not serving a parole revocation term as required under section 6601, subdivision (a)(1) and (3).[7] As we explain, we find no merit in his arguments and conclude that Bell remained in the CDCR's jurisdiction when he was incarcerated in county jail and that he was in custody on a parole revocation term. Moreover, we find that even if Bell's parole revocation was unlawful, its unlawfulness

---

[7] Below and on appeal, the parties refer to section 6601, subdivision (a)(1) and (2). Former section 6601, subdivision (a)(2) was renumbered to section 6601, subdivision (a)(3) without substantive change as of January 1, 2022. (Stats. 2021, ch. 383, § 1.) We reference the provision by its current designation in our analysis.

9

was the result of a good faith mistake of law or fact, which precludes the dismissal of the SVP petition.

### 1. *Jurisdictional Requirements for Filing an SVP Petition*

Section 6601, subdivision (a)(1) sets forth in pertinent part that "[w]hen the Secretary of the [CDCR] determines that an individual who is in custody under the jurisdiction of the [CDCR], who is either serving a determinate prison sentence or whose parole has been revoked, and who is not in custody for the commission of a new offense committed while the individual was serving an indeterminate term in a state hospital as a sexually violent predator, may be a sexually violent predator, the secretary shall, at least six months prior to that individual's scheduled date for release from prison, refer the person for evaluation in accordance with this section." In other words, section 6601, subdivision (a)(1) provides that when the CDCR determines that an inmate who is "in custody under [its] jurisdiction" may be a sexually violent predator, a referral for an evaluation must be made within the specified time frame.

For an SVP petition to be filed, an inmate must be "in custody." (§ 6601, subd. (a)(3).) Section 6601, subdivision (a)(3) provides in pertinent part: "A petition may be filed under this section if the individual was in custody pursuant to a determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed."

Read together, section 6601, subdivision (a)(1) and (3) limit SVP proceedings to those inmates within the CDCR's jurisdiction who are in custody serving a determinate sentence, a parole revocation term, or under a hold described under section 6601.3.

### 2. *CDCR Jurisdiction*

First, Bell argues that the trial court lacked the jurisdiction to proceed on the SVP petition because he was not under the CDCR's jurisdiction when the petition was filed, a statutory prerequisite as described under section 6601, subdivision (a)(1) and (3). We conclude that under Penal Code section 3000.09, as a parolee who was paroled prior to

10

October 1, 2011, Bell remained under the CDCR's jurisdiction even when he was incarcerated in county jail on his pending criminal charges and alleged parole violation.

### a. *Standard of Review and Principles of Statutory Interpretation*

Bell's arguments pertaining to the trial court's jurisdiction to consider his SVP petition are a matter of statutory interpretation, which we review de novo. (*People v. Jimenez* (2020) 9 Cal.5th 53, 61 (*Jimenez*).)

When interpreting a statute, "[w]e look first to ' "the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context." ' " (*Jimenez*, *supra*, 9 Cal.5th at p. 61.) " '[I]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' " (*People v. Valencia* (2017) 3 Cal.5th 347, 357 (*Valencia*).)

"To that end, we generally must 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and have warned that '[a] construction making some words surplusage is to be avoided.' " (*Valencia*, *supra*, 3 Cal.5th at p. 357.) The words of a statute must be viewed in context and " 'statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " (*Ibid*.) If there is uncertainty, " 'consideration should be given to the consequences that will flow from a particular interpretation.' " (*Id*. at p. 358.) And "[w]hen a statute is ambiguous, we may consider its legislative history and the statute's purpose." (*People v. Arias* (2008) 45 Cal.4th 169, 182.)

### b. *Bell Remained Under the CDCR's Jurisdiction*

On appeal, Bell argues that amendments made to Penal Code section 3056 under the 2011 Criminal Justice Realignment Act (Stats. 2011, 1st Ex. Sess. 2011-2012, ch.12, § 1, hereafter "Realignment") divested the CDCR of legal custody and jurisdiction over parolees in his situation. Thus, Bell claims that when his SVP petition was filed, the

11

county jail where he was incarcerated exercised full legal custody and jurisdiction over him.

Prior to Realignment, "virtually all authority over parole and parolees—including whether a period of parole was to be required; if so, its duration and conditions; and the power to revoke parole—resided in the paroling authority, either the [CDCR] or the Board of Parole Hearings . . . ." (*People v. VonWahlde* (2016) 3 Cal.App.5th 1187, 1196 (*VonWahlde*).) Following Realignment, trial courts are now vested with an enhanced role in the supervision of parolees. (*Ibid.*)

Realignment, however, did not eliminate the CDCR's jurisdiction over parolees like Bell, who was released on parole in 2008. Penal Code section 3000.09, subdivision (a) provides that "[n]otwithstanding any other law, any parolee who was paroled from state prison prior to October 1, 2011, shall be subject to this section." Penal Code section 3000.09 specifies that parolees released from state prison prior to October 1, 2011 "remain under supervision" (*id.*, subd. (b)) of the CDCR until certain events occur, such as if "[j]urisdiction over the person is terminated by operation of law" (*id.*, subd. (b)(1)) or if the parolee is discharged from parole (*id.*, subd. (b)(2)). Although the statute is silent as to whether the CDCR retains *jurisdiction* over parolees, the statute's mandate that such parolees are subject to the CDCR's "supervision" until "jurisdiction . . . is terminated" suggests that the CDCR retains jurisdiction over these individuals.

This statutory construction is supported by the plain language of Penal Code section 3000.09, subdivision (d), which states that parolees who are paroled prior to October 1, 2011, and who commit new violations of parole, shall "be subject to parole revocation procedures in accordance with the rules and regulations of the department

12

consistent with Division 2 of Title 15 of the California Code of Regulations."[8]  Division 2 of title 15 of the California Code of Regulations sets forth the policies and procedures for the supervision of parolees by the Board, including procedures for the revocation of parole.[9]  Thus, Penal Code section 3000.09 grants the CDCR with jurisdiction—i.e., authority over the supervision of parolees and the power to hear and decide parole revocations—over parolees like Bell.  (See *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653 [lack of jurisdiction in its most fundamental sense is an absence of power to hear or determine the case; an absence of authority over the subject matter or the parties].)

Moreover, to the extent that there is any ambiguity in Penal Code section 3000.09, we may consider the statute's legislative history.  The uncodified preamble to Assembly Bill No. 109 (Stats. 2011, ch. 15), which enacted Penal Code section 3000.09, stated in part:  "Existing law generally commits persons convicted of felonies to the jurisdiction of the Department of Corrections and Rehabilitation.  Existing law also provides for parole of those felons, under the jurisdiction of the Board of Parole Hearings."  The preamble then explained:  "This bill would require that any parolee who was paroled from state prison prior to July 1, 2011, be subject to certain parole supervision requirements, including, but not limited to, that he or she remain under the supervision of the department until a specified circumstance occurs, and that those parolees, being held for a parole violation in county jail on July 1, 2011, be subject to the *jurisdiction* of the

---

[8] Penal Code section 3000.09, subdivision (d) further provides that parolees who are paroled prior to October 1, 2011, shall be subject to the revocation procedures described under Penal Code section 3000.08 "[o]n and after July 1, 2013."  This section is inapplicable to Bell's case, as his alleged parole violation took place prior to July 1, 2013.

[9] The CDCR is composed of various entities, including the Board of Parole Hearings.  (Gov. Code, § 12838.)  Thus, references to the Board of Parole Hearings' jurisdiction over parolees generally equates to the CDCR's jurisdiction over parolees.

13

board."[10]  (Italics added.)  Accordingly, the preamble to Assembly Bill No. 109 indicates that the Legislature intended the Board of Parole Hearings, and by extension, the CDCR, to have continued jurisdiction over parolees like Bell.

Bell disagrees and argues that Penal Code section 3056 expressly divests the CDCR of its jurisdiction over parolees and vests jurisdiction solely with local facilities. Bell relies on the language of Penal Code section 3056, subdivision (a), which states that "[w]hen a parolee is under the legal custody and jurisdiction of a county facility awaiting parole revocation proceedings or upon revocation, the parolee shall not be under the parole supervision or jurisdiction of the department."  Bell also argues that the CDCR's retention of "supervision" over parolees is substantively different than retention of both "custody and jurisdiction," and a parolee is only "supervised" when not in local custody. In part, Bell relies on 2011 amendments made to Penal Code section 3056, which now states that "[p]risoners on parole shall remain under the *supervision* of the department . . . ."  (Pen. Code, § 3056, subd. (a), italics added.)  Prior to this amendment, former Penal Code section 3056 stated that "[p]risoners on parole shall remain under the *legal custody* of the department . . . ."  (Italics added.)  (Former Pen. Code, § 3056; Stats. 2011, ch. 15, § 474.)

We find no merit in Bell's claims.  Penal Code section 3056 generally addresses all parolees, but Penal Code section 3000.09 specifically applies to parolees released on parole prior to October 1, 2011.  As the more specific statute, Penal Code section 3000.09 " 'take[s] precedence over' the more general" statute.  (*People v. Adelmann* (2018) 4

---

[10] As described, the uncodified preamble to Assembly Bill No. 109 referenced parolees held in county jail on July 1, 2011.  Assembly Bill No. 109, which enacted Penal Code section 3000.09, initially applied to parolees paroled from state prison prior to July 1, 2011.  (Stats. 2011, ch. 15, § 470.)  Penal Code section 3000.09, however, was subsequently amended by Assembly Bill No. 117 to specify that its provisions applied to parolees paroled from state prison prior to October 1, 2011 (Stats. 2011, ch. 39, § 39).

Cal.5th 1071, 1079.) And under Penal Code section 3000.09, Bell remained under the CDCR's jurisdiction despite his new violation of parole and incarceration in county jail.

For these reasons, we must also reject Bell's claim that the legislative history and the goals of Realignment support his claim that the CDCR failed to retain jurisdiction over parolees such as himself. While Realignment generally vested trial courts with an enhanced role in the supervision of certain groups of parolees (see *VonWahlde*, *supra*, 3 Cal.App.5th at p. 1196), the text of Penal Code section 3000.09 and its legislative history make clear that Realignment did not divest the CDCR of custody and jurisdiction over parolees who were released on parole *prior* to October 1, 2011. (Pen. Code, § 3000.09.)[11]

Finally, Bell argues that should we conclude that the CDCR retained jurisdiction over parolees such as himself, the CDCR would be unconstitutionally permitted, in violation of due process, to serially subject a parolee to SVP evaluations and petitions during the entirety of a parolee's parole period until it is able to find two evaluators who agree that the parolee is an SVP as defined under the SVP Act. Bell's claim ignores that section 6601, subdivision (a)(1) requires referrals for an SVP evaluation only for those

---

[11] Additionally, we also find no merit in Bell's argument that his position is supported by the fact that the CDCR disclaimed jurisdiction over parolees in *Armstrong v. Brown* (2012) 857 F.Supp.2d 919. *Armstrong* concerned an injunction that required the CDCR to ensure that prisoners and parolees with disabilities are accessibly housed. (*Id*. at p. 924.) In part, the CDCR argued to the federal court that "after July 1, 2013, control over parole revocation proceedings and decisions will transfer from [the CDCR] to local courts, although [the CDCR] will continue to supervise parolees." (*Id*. at p. 929.) The CDCR's argument to the federal government in *Armstrong* is not a binding interpretation of the relevant statutes. Moreover, the CDCR acknowledged in *Armstrong* that it "continue[d] to have responsibility for certain groups of state prisoners and parolees housed in county jail: those already there 'as of October 1, 2011 pending parole revocation proceedings, offenders sentenced to life terms who may return to state prison, and state inmates housed in county jail for county proceedings.' " (*Ibid*.) Here, Bell was arrested in May 2011 and signed his first optional waiver in June 2011.

15

inmates under the CDCR's jurisdiction who are serving a determinate prison term or a parole revocation term. Bell also ignores the requirement of section 6601, subdivision (a)(3), which permits SVP petitions to be filed only if "the individual was in custody pursuant to a determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3." Our construction of the relevant statutes does not permit the CDCR to evaluate and file SVP petitions for *all* parolees, regardless of whether they are in custody. Only those parolees who are in custody as specified under section 6601, subdivision (a)(1) and (3) will be subject to SVP proceedings.

For these reasons, we conclude that Bell was under the CDCR's jurisdiction at the time the SVP petition was filed as required under the SVP Act.

### 3. *"In Custody" Requirement*

Next, Bell argues that he was not in custody pursuant to a parole revocation term as required by section 6601, subdivision (a)(1) and (3) when the SVP petition was filed because he had requested a full revocation hearing on April 11, 2012. He argues that notwithstanding his prior decision to sign an optional waiver, his parole was no longer considered revoked once he requested a full revocation hearing.

### a. *Bell was Serving a Parole Revocation Term*

Bell's argument that he was not serving a parole revocation term is primarily based on his reading of the "optional waiver" procedure described in former California Code of Regulations, title 15, section 2641, subdivision (b), which states that the Board of Parole Hearings "shall schedule a revocation hearing" upon receiving a request for a full revocation hearing. He claims that interpreting former California Code of Regulations, title 15, section 2641, subdivision (b) as maintaining a parolee in revoked status even after he or she requests a full revocation hearing violates due process. He further argues that a correct interpretation of former California Code of Regulations, title 15, section 2641, subdivision (b) is that once a parolee has requested a full revocation hearing, a parolee is no longer serving a parole revocation term. The CDCR's

16

interpretation, however, is that under the regulation, Bell's parole remained revoked, and he was serving a parole revocation term until he was discharged from parole on May 16, 2012.

Former California Code of Regulations, title 15, section 2641, subdivision (b) described the optional waiver as follows: "A parolee who is undergoing criminal prosecution may conditionally waive the revocation hearing, but retain the option to request a hearing as provided in this subsection. Upon receipt of a signed optional waiver, the Board at the central office calendar will determine whether there is good cause to revoke parole. This determination will be made without a hearing or personal appearance by the parolee. [¶] If the Board orders parole revoked and the parolee returned to custody, the parolee then may request a revocation hearing. A hearing request must be received by the Board no more than 15 days following sentencing or final disposition at the trial court level in the criminal proceedings and no later than two months before expiration of the revocation period ordered by the Board at the central office calendar. Upon receipt of a hearing request, the Board shall schedule a revocation hearing. At the hearing the panel may take any appropriate action."

" 'Rules governing the interpretation of statutes also apply to interpretation of regulations. [Citation.] "In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage." ' " (*In re Villa* (2013) 214 Cal.App.4th 954, 964.) "We accord deference to the CDCR's interpretation of the governing regulations in matters that fall within its expertise." (*Ibid*.) However, "[t]he interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such legal questions rests with the courts." (*Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310.)

The language of California Code of Regulations, title 15, section 2641, subdivision (b) makes clear that *once* a parolee signs the optional waiver, the Board of Parole Hearings can revoke a parolee's parole. Former California Code of Regulations, title 15, section 2641, subdivision (b) expressly states that "[i]f the Board orders parole revoked and the parolee returned to custody, the parolee then may request a revocation hearing." California Code of Regulations, title 15, section 2641, however, is silent as to what happens to a parolee's status if he or she initially signed an optional waiver but subsequently requests a full revocation hearing.

Because California Code of Regulations, title 15, section 2641, subdivision (b) lacks clarity as to what happens to such parolees, we may turn to the CDCR's interpretation of its own regulations for guidance. Here, CDCR Associate Chief Deputy Commissioner Moeller testified that the CDCR considers a parolee to be in revoked status after an optional waiver is signed. Moeller also testified that once a parolee requests a full revocation hearing, a revocation hearing will be scheduled, but the CDCR still considers the parolee to be in "revocation status." Lastly, Moeller testified that based on his interpretation of the regulation, Bell remained in revoked status until he was discharged from parole. Moeller's testimony is evidence that the CDCR's interpretation of its own regulation is that a parolee remains in revoked status even *after* a full revocation hearing has been requested following the execution of an optional waiver.

Additionally, Moeller's interpretation of Bell's custody status and former California Code of Regulations, title 15, section 2641, subdivision (b) is corroborated by the CDCR's records of Bell's parole status. According to Bell's CDCR "Chronological History," Bell's parole was revoked after he signed the optional waiver. There were no notations in Bell's "Chronological History" in April 2012, when he subsequently activated his optional waiver and requested a full revocation hearing. However, his "Chronological History" subsequently reflected that on May 10, 2012, he was discharged at the "statutory maximum" and that the "previous BPH action of [March 2012 was]

18

rescinded." Moeller later testified that the CDCR's written notes should have reflected that Bell was discharged from parole on May 16, 2012, the date that his parole violation was dismissed. Thus, the evidence reflects that the CDCR considered Bell's parole to be revoked and that it remained revoked until he was discharged from parole.

Bell claims that there is evidence that the CDCR's interpretation of California Code of Regulations, title 15, section 2641, subdivision (b) is that a parolee is no longer in revoked status once he or she activates an optional waiver. Bell relies on a memorandum from the Board of Parole Hearings that states that "[w]hen an Optional Waiver is accepted, the parolee is placed in revoked status until or unless revocation proceedings are re-opened." The memorandum, however, does not expressly state that a parolee's status is no longer in revoked status immediately after a full revocation hearing is requested. The memorandum also does not define what it means to "re-open revocation proceedings," though it states that "[r]equests to re-open revocation proceedings should be made as soon as possible following sentencing or final disposition at the trial court level in criminal proceedings." A reasonable interpretation, which is consistent with Moeller's testimony, is that requesting a full revocation hearing is a "request to re-open revocation proceedings" and "revocation proceedings are re-opened" once the CDCR acts on the request by holding a full revocation hearing, during which the merits of the parole violation will be adjudicated.

Citing *Morrissey v. Brewer* (1972) 408 U.S. 471, Bell argues that even if his parole was revoked after he signed his optional waiver, he was entitled to a full revocation hearing within a reasonable time frame after he rescinded his optional waiver in April 2012. In *Morrissey*, the United States Supreme Court held that parolees facing revocation are entitled to certain due process protections, including a requirement that a parolee be entitled to a hearing, "if it is desired by the parolee," prior to the revocation of parole. (*Id.* at p. 487.) Our interpretation of California Code of Regulations, title 15, section 2641, subdivision (b) does not infringe upon the due process protections

19

described in *Morrissey*. California Code of Regulations, title 15, section 2641, subdivision (b) expressly provides a parolee with the right to have a full revocation hearing after signing an optional waiver. Under the CDCR's interpretation of the regulation, a parolee's parole is revoked only *after* he or she has expressly consented to waive a full revocation hearing with an optional waiver and has accepted the assessment offer. There is no revocation of parole without the parolee's initial consent.

Bell also argues that his due process rights were violated under the optional waiver procedure because he was not given notice that by signing the optional waiver, he was "irretrievably waiving his right to a full revocation hearing" and that his optional waiver "[became] irrevocable at some point in the future." We find no violation of due process because Bell retained his right to request a full revocation hearing—a right that he exercised. That the CDCR considered his parole to be revoked *until* the requested revocation hearing took place did not render it futile for Bell to request a hearing, nor did it render him unable to obtain a hearing.[12]

For these reasons, we conclude that Bell was serving a parole revocation term at the time the SVPA petition was filed. This interpretation of the CDCR's regulations is consistent with its language, does not render any of the words surplusage, and gives weight to the CDCR's interpretation of its own regulations.

### b. *The Good Faith Mistake Provision Applies*

Alternatively, assuming that Bell's interpretation of former California Code of Regulations, title 15, section 2641, subdivision (b) is correct and he was not lawfully serving a parole revocation term once he requested a full revocation hearing, we conclude

---

[12] Moreover, the signed optional waiver forms reflect that Bell was represented by counsel when he executed the optional waiver forms in both June 2011 and March 2012. Bell does not claim that his counsel failed to adequately advise him of the consequences of signing the optional waiver form.

that the trial court did not err when it found that the good faith mistake provision of section 6601, subdivision (b) precluded the dismissal of the SVP petition.

### i. *General Legal Principles and the Good Faith Mistake Provision*

As we have stated, a prerequisite for the filing of an SVP petition is that an inmate be "in custody." (§ 6601, subd. (a)(3).) However, lawful custody is not a jurisdictional requirement for filing an SVP petition. Section 6601, subdivision (a)(3) provides: "A petition may be filed under this section if the individual was in custody pursuant to a determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed. A petition shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law."

Generally, "[t]he phrase 'good faith' is . . . understood 'to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.' " (*Langhorne v. Superior Court* (2009) 179 Cal.App.4th 225, 239 (*Langhorne*).) "The existence of good faith is determined by the circumstances existing at the time of the alleged good faith act, and ' "not by virtue of hindsight." ' " (*Ibid.*)

The good faith mistake provision found in section 6601, subdivision (a)(3) can be traced to *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864 and *People v. Superior Court* (*Whitley*) (1999) 68 Cal.App.4th 1383 (*Whitley*). (*Smith*, *supra*, 42 Cal.4th at p. 1260.) In *Terhune*, the Court of Appeal determined that a CDCR regulation that permitted parole revocations for psychiatric treatment was invalid and was an act in excess of the CDCR's statutory authority. (*Terhune*, *supra*, at pp. 878-880.) In the follow-up case, *Whitley*, the same inmate from the *Terhune* case challenged his SVP commitment after he was found to be an SVP based on a petition that was filed when his

21

parole was revoked for psychiatric treatment under the regulation found invalid in *Terhune*. (*Whitley*, *supra*, at pp. 1389-1390.) *Whitley* concluded that despite the CDCR's "legal error" in revoking the inmate's parole, the trial court could still consider the SVP petition. (*Id*. at p. 1390.) In part, *Whitley* observed that there was nothing to indicate "negligent or intentional wrongdoing" by the CDCR when it revoked the inmate's parole; thus, the trial court retained jurisdiction to consider the SVP petition. (*Ibid*.)

Following *Whitley*, former section 6601, subdivision (a)(2) was added to the SVP Act in 1999. (*Smith*, *supra*, 42 Cal.4th at p. 1260.) Former section 6601, subdivision (a)(2) was renumbered to section 6601, subdivision (a)(3) as of January 1, 2022. (Stats. 2021, ch. 383, § 1.) And when enacting former section 6601, subdivision (a)(2), the "legislative committee analyses made clear that it was intended to adopt a rule similar to the holding in [(*Whitley*)]." (*Smith*, *supra*, at p. 1260.) The legislative analyses for former section 6601, subdivision (a)(2) explained that the statute was meant to address mistakes of law and fact, including technical error or mistakes in arithmetic in the calculation of credits, which could result in an untimely filing of an SVP petition. (*Smith*, *supra*, at p. 1261.)

"In view of [former section 6601, subdivision (a)(2)], when an untimely petition is filed and the individual is held beyond the end of his prison or parole revocation term (and any § 6601.3 hold) in order to facilitate sexually violent predator proceedings, 'the custody becomes unlawful and the petition must be dismissed unless the unlawful custody resulted from a good faith mistake of fact or law.' " (*People v. Superior Court* (*Sokolich*) (2016) 248 Cal.App.4th 434, 446.)

ii. ***Standard of Review***

Here, the trial court found that even if former California Code of Regulations, title 15, section 2641, subdivision (b) was invalid, the good faith mistake provision applied to Bell's case and precluded dismissal of the SVP petition. "We review the trial

22

court's finding of good faith under the substantial evidence standard of review." (*Langhorne*, *supra*, 179 Cal.App.4th at p. 238.) " '*Good faith*, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursuing it? A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence. Because the good faith issue is factual, the question on appeal will be whether the evidence was sufficient to sustain the trial court's finding.' " (*Id*. at pp. 238-239.)

### iii. *Bell Challenges the Lawfulness of His Parole Revocation Term*

We first address Bell's claim that the good faith mistake provision codified in section 6601, subdivision (a)(3) is inapplicable because he is not contesting the lawfulness of his underlying custody. Bell concedes that his arrest and subsequent incarceration on his pending criminal charges in San Mateo County was lawful. Thus, Bell insists that he is not challenging the lawfulness of his custody; rather, he is arguing that the SVP petition should be dismissed because he was not under the CDCR's jurisdiction and was not serving a parole revocation term when the SVP petition was filed. Bell claims that there is no good faith exception to the statutory requirements of section 6601, which require both that the CDCR has jurisdiction over an inmate and that an inmate be in custody either for a determinate prison term or a parole revocation term. We disagree.

First, we have already rejected Bell's argument that he was not under the CDCR's jurisdiction at the time the SVP petition was filed. As we have determined, Bell, as a parolee who was paroled prior to October 1, 2011, remained within the CDCR's jurisdiction under Penal Code section 3000.09.

Second, Bell's claim that the good faith mistake provision is inapplicable would require us to consider in isolation the latter part of section 6601, subdivision (a)(3), which states that a SVP petition shall not be dismissed if there is a later determination that the

23

individual's "custody was unlawful." Based on this language, Bell would have us construe the good faith mistake provision as applying only if he was challenging his underlying incarceration. However, " '[t]he meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.' " (*People v. Shabazz* (2006) 38 Cal.4th 55, 67.) Section 6601, subdivision (a)(3) begins by stating that a SVP petition may be filed if an individual was "in custody pursuant to a determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition [was] filed." Construing the statute, section 6601, subdivision (a)(3)'s reference to "unlawful custody" applies to situations where there is a later determination that an individual was not in lawful custody pursuant to a determinate prison term, parole revocation term, or a hold pursuant to section 6601.3. And here, Bell's argument is that he was not *in lawful custody pursuant to a parole revocation term* when the SVP petition was filed as required by section 6601, subdivision (a)(3), which is precisely the type of situation that the good faith mistake provision addresses.

We therefore proceed to examine whether the trial court erred in finding the good faith mistake provision applicable to Bell's case.

### iv. *Substantial Evidence Supports the Trial Court's Good Faith Finding*

Bell argues that the SVP petition in this case was not filed when he was lawfully serving a parole revocation term because he had activated his optional waiver and had requested a full revocation hearing. However, we conclude that substantial evidence supports the trial court's finding that, assuming Bell was *not* serving a lawful parole revocation term under the optional waiver procedures described in former California Code of Regulations, title 15, section 2641, subdivision (b), his unlawful custody was the result of a good faith mistake of law.

24

As we have observed, former California Code of Regulations, title 15, section 2641 is silent as to what happens to a parolee's status when he or she signs an optional waiver but subsequently requests a full revocation hearing. However, the CDCR's records of Bell's "Chronological History" and Moeller's testimony reflected that the CDCR considered Bell's parole to be revoked after he executed the optional waiver in June 2011 until he was discharged at the "statutory maximum" on May 16, 2012. Moeller testified that a revocation hearing will be scheduled once a parolee requests a full revocation hearing, but the CDCR still considers the parolee to be in "revocation status."[13] Gillham, a staff services manager at the Department of Mental Health, also testified that when she receives documentation from the Board of Parole Hearings that a parolee has signed an optional waiver, she generally perceives this as a determination that the parolee's parole has been revoked and the Department of Mental Health can move forward with initiating proceedings under the SVP Act. And as we have previously determined, the Board's memorandum, which states that "[w]hen an Optional Waiver is accepted, the parolee is placed in revoked status until or unless revocation proceedings are re-opened," is not inconsistent with Moeller's interpretation.

The good faith mistake provision can be traced to *Whitley*, which found that an SVP petition should not be dismissed even though the CDCR's legal basis for revoking parole is later deemed invalid. (*Whitley*, *supra*, 68 Cal.App.4th at pp. 1389-1390; see also *People v. Wakefield* (2000) 81 Cal.App.4th 893, 899 [accord].) This situation is analogous to *Whitley*. Even if we assume that the optional waiver procedure described in

_____

[13] In his opening brief, Bell argues that even if his parole remained in "revoked" status when he activated the optional waiver, former California Code of Regulations, title 15, section 2641, subdivision (b) cannot be said to "turn that revocation into a 'parole revocation term.' " Bell cites no authority or analysis for the proposition that a parolee whose parole is in "revoked" status is not serving a "parole revocation term." Bell has forfeited this argument by failing to develop it with citations and analysis. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.)

former California Code of Regulations, title 15, section 2641 is invalid, or that the CDCR erred in its implementation of its own regulation, the CDCR's revocation of parole would have been based on its good faith mistake of law and a misunderstanding of the scope of its discretion to revoke parole. There is no controlling legal authority on point that disapproved of the optional waiver procedure as interpreted by the CDCR. Accordingly, there is no evidence that the CDCR acted in bad faith when it revoked Bell's parole after he signed the optional waiver, nor was there evidence that the CDCR acted in bad faith when it considered Bell's parole to be revoked even after he requested a full revocation hearing. (*Whitley*, *supra*, at pp. 1389-1390.)

Bell relies on *In re Franklin* (2008) 169 Cal.App.4th 386 and argues that the good faith mistake provision is inapplicable to his case. In *Franklin*, the Fifth Appellate District held that an inmate whose underlying felony conviction had been reversed was no longer subject to SVP proceedings, although he remained in custody at the time the SVP petition was filed. (*Id*. at p. 392.) The inmate was a misdemeanant awaiting transportation to the superior court for a misdemeanor probation and sentencing hearing; thus, he was not in custody either serving a determinate prison sentence or a parole revocation term as required under section 6601, subdivision (a)(1). (*Franklin*, *supra*, at p. 392.) The *Franklin* court found the good faith mistake provision to be inapplicable because the appellate opinion reversing the inmate's felony conviction was final before the SVP petition was filed. (*Ibid*.) Therefore, *Franklin* observed that there was no " '*later* judicial or administrative determination' " that the inmate's custody was unlawful as required under section 6601, subdivision (a)(3). (*Franklin*, *supra*, at p. 392.) *Franklin* is distinguishable. Here, there was no prior adjudication or determination that Bell's parole revocation was unlawful at the time the SVP petition was filed.

Bell argues that there can be no good faith mistake because "the law that divested the CDCR of jurisdiction over [Bell] was effective October 1, 2011," before the SVP petition was filed in his case. Although Bell does not specify which "law" he is referring

to, we infer from his previous arguments that he is referencing Penal Code section 3056. Bell's claim that the passage of Penal Code section 3056 reflects bad faith by the CDCR or the district attorney is without merit. As we have determined, Penal Code section 3000.09 takes precedent over Penal Code section 3056 for parolees like Bell who were paroled before October 1, 2011. (See Pen. Code, § 3000.09.)[14]

In sum, we conclude that substantial evidence supports the trial court's finding of good faith mistake of law, and because any alleged unlawful custody would have been due to the-good faith mistake, section 6601, subdivision (a)(3) precludes dismissal of Bell's SVP petition. (*Langhorne*, *supra*, 179 Cal.App.4th at p. 238.)[15]

B. *Equal Protection*

Finally, Bell argues that the trial court violated his right to equal protection when it denied his motions to dismiss his SVP petition. Bell relies on *Smith*, *supra*, 42 Cal.4th 1251, which held that SVP commitment proceedings could not be authorized under the good faith mistake provision if the underlying felony conviction that was the basis of an inmate's custody was subsequently reversed by a reviewing court. (*Id*. at p. 1255.) Bell argues that he is similarly situated to the petitioner in *Smith* because the criminal charges underlying his parole violation and his parole violation were subsequently dismissed. As we explain, we conclude that Bell is not similarly situated to the *Smith* petitioner and his claims of equal protection fail.

---

[14] Additionally, Bell claims that the CDCR lost jurisdiction over him in October 2011 after the passage of the Realignment Act, and the good faith mistake provision cannot excuse a failure to comply with Realignment's requirement that local facilities now retain custody and jurisdiction of parolees awaiting a revocation hearing. However, we have rejected Bell's argument that Realignment divested the CDCR of jurisdiction over parolees in his situation.

[15] Based on our conclusion that the SVP petition was properly filed, we find no merit in Bell's contention that his due process rights were violated because the trial court failed to comply with the SVP Act.

1. *General Legal Principles and Standard of Review*

"The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally. [Citation.] Accordingly, ' "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." ' [Citation.] 'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Brown* (2012) 54 Cal.4th 314, 328 (*Brown*).) We review an equal protection claim de novo. (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.)

2. *Parolees Are Not Similarly Situated to Defendants Whose Criminal Convictions Have Been Reversed*

Bell argues that he is similarly situated to the petitioner in *Smith*. In *Smith*, the petitioner's underlying criminal conviction was reversed, and in Bell's case the underlying criminal charges that formed the basis for his parole violation were dismissed. (*Smith*, *supra*, 42 Cal.4th at p. 1256.) Bell, however, is not similarly situated to the petitioner in *Smith* because he was a parolee who was serving a parole revocation term at the time the SVP petition was filed.

In *Smith*, *supra*, 42 Cal.4th 1251, the petitioner was convicted of failing to register as a sex offender and sentenced to prison. (*Id*. at p. 1255.) He appealed his conviction first to the Court of Appeal and then to the California Supreme Court, which granted review. (*Id*. at pp. 1255-1256.) While the petitioner's appeal was pending with the California Supreme Court, an SVP petition was filed seeking to have him committed as an SVP. (*Id*. at p. 1256.) Subsequently, the California Supreme Court reversed the petitioner's conviction after concluding that the trial court committed reversible error by instructing the deadlocked jury that a person who is required to register as a sex offender must ensure that a notification of a change of address has been received by the police.

28

(*Ibid.*)  Before the SVP proceedings commenced any further, the petitioner filed several habeas corpus petitions, arguing that the SVP Act did not permit the continuation of SVP proceedings once his criminal conviction had been reversed and that his continued commitment violated his rights to due process and equal protection.  (*Ibid.*)

On appeal, the California Supreme Court considered whether the good faith mistake provision found in former section 6601, subdivision (a)(2) permitted the continuation of SVP proceedings against the *Smith* petitioner.  (*Smith*, *supra*, 42 Cal.4th at pp. 1257-1259.)  *Smith* examined the petitioner's equal protection argument and analyzed whether the petitioner was being treated differently than those subject to the state's general civil commitment statute, the Lanterman-Petris-Short Act (LPS Act).  (*Id.* at p. 1267.)  *Smith* noted that under the SVP Act, those currently in prison with convictions for qualifying sexual offenses are subject to continued civil commitment based solely on the finding that the individual has a mental disorder that makes it likely that he or she will engage in sexually violent criminal behavior.  (*Id.* at p. 1268.)  In contrast, under the LPS Act, those not in prison, including those who may have the same prior convictions for sexually violent offenses, are subject to long-term civil commitments only if it has been determined that he or she is "gravely disabled" or has "a mental disorder" *and* that he or she is "a danger to self and others as shown by recent acts."  (*Ibid.*)

*Smith* found that the justification for treating the petitioner differently than those not in prison custody was unclear because the petitioner's conviction had been reversed and, "[i]n terms of potential dangerousness, a person whose felony conviction has been reversed is in the same position as someone who was charged with, but not convicted of, a felony offense, yet it is undisputed that the latter could not be subject to SVP proceedings."  (*Smith*, *supra*, 42 Cal.4th at p. 1269.)  Moreover, those whose convictions were reversed *before* an SVP petition was filed would not be subject to SVP commitment proceedings.  (*Ibid.*)

Bell argues that he is similarly situated to the *Smith* petitioner because it would be fundamentally unfair to maintain SVP proceedings against him even though there is no credible evidence that he committed the acts underlying his criminal charges in 2011, which in turn formed the basis for his alleged parole violation. We disagree. In *Smith*, the California Supreme Court specifically addressed whether parolees were similarly situated to the *Smith* petitioner, and the *Smith* court held that its construction of former section 6601, subdivision (a)(2) "would still allow the state to proceed against those whose initial prison custody was valid, but who might evade SVP commitment due to erroneous parole revocations or extensions of sentence, the groups of prisoners against whom [former] section 6601[, subdivision] (a)(2) was targeted." (*Smith*, *supra*, 42 Cal.4th at p. 1269.) *Smith* noted that "[s]ubjecting these classes of prisoners to SVP proceedings does not raise the equal protection problems discussed in the present case. It is certainly justifiable in equal protection terms . . . to treat convicted prisoners differently for purposes of civil commitment from the general population, even when those prisoners stand to evade the statutory time limits for initiating SVP proceedings due to good faith factual or legal error. Moreover, a prisoner on parole remains in constructive custody [citations], and is not similarly situated, for purposes of the equal protection issue posed by this case, to a prisoner whose conviction that was the basis of his or her custody is reversed due to prejudicial error." (*Id*. at p. 1270.)

Although *Smith*'s statement about parolees was not necessary to its decision and was thus dicta, we find its analysis persuasive. (See *People v. Valencia* (2011) 201 Cal.App.4th 922, 929.) Here, Bell was a convicted prisoner who was on parole when the SVP petition was later filed. (*Smith*, *supra*, 42 Cal.4th at p. 1270.) That his subsequent parole violation was dismissed does not place him on the same footing as the *Smith* petitioner, whose case involved the "invalidation of the very judicial determination that had originally made the custody lawful." (*Id*. at p. 1261.) And, even if we assume that former California Code of Regulations, title 15, section 2641, subdivision (b)'s optional

waiver process was either invalid or erroneously applied by the CDCR, any erroneous parole revocation would have been the result of "good faith factual or legal error." (*Smith*, *supra*, at p. 1270.)

Accordingly, we conclude that Bell is not similarly situated to the petitioner in *Smith*, and the trial court's decisions to deny his motions to dismiss his SVP petition did not violate his right to equal protection under the law. (*Brown*, *supra*, 54 Cal.4th at p. 328.)

## III. DISPOSITION

The judgment is affirmed.

_____
                        Wilson, J.


WE CONCUR:




_____
         Danner, Acting P.J.




_____
         Lie, J.




People v. Bell
H047364